JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
ANNE MARIE MURPHY (SBN 202540)
amurphy@cpmlegal.com
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
KARIN B. SWOPE (Pro Hac Vice)
kswope@cpmlegal.com
ANDREW F. KIRTLEY (SBN 328023)
akirtley@cpmlegal.com
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Co-Lead Counsel for Plaintiffs and the
Proposed Class*

MICHAEL RUBIN (SBN 080618)
mrubin@altber.com
STACEY M. LEYTON (SBN 203827)
sleyton@altber.com
MATTHEW MURRAY (SBN 271461)
mmurray@altber.com
CONNIE K. CHAN (SBN 284230)
cchan@altber.com
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

*Co-Lead Counsel for Plaintiffs and the
Proposed Class*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JENNIFER YICK,**<br>**ROLAND OOSTHUIZEN,**<br>**ROSEMARY MATHEWS,**<br>**CARLOS RODRIGUEZ,**<br>**J. MICHAEL WILLRICH,**<br>**LINDSAY MCCLURE,**<br>**ROBERT L. WILSON,**<br>**CHRISTOPHER MOSSON,**<br>**CLARA CAJAS,**<br>**STEPHANIE SMITH,**<br>**ALAN KARAM,**<br>**AZURI MOON,**<br>**VANESSA RIVERA,**<br>**CANDACE KOOLE, and**<br>**LUIS PEREZ,** on behalf of themselves<br>and all others similarly situated,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>**BANK OF AMERICA, N.A.;** and<br>DOES 1 through 50, inclusive,<br><br>                    Defendants. | **Case No. 3:21-cv-00376-VC**<br><br><u>CLASS ACTION</u><br><br>**NOTICE OF MOTION AND MOTION**<br>**FOR PRELIMINARY INJUNCTION**<br>**AND PROVISIONAL CLASS**<br>**CERTIFICATION; MEMORANDUM OF**<br>**POINTS AND AUTHORITIES**<br><br>Date:  May 13, 2021<br>Time: 2:00 p.m.<br>Crtm: 4, 17th Floor<br>Judge: Hon. Vince Chhabria |

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on May 13, 2021, at 2:00 p.m., or as soon thereafter as this matter may be heard before the Honorable Vince Chhabria, in Courtroom 4 of the United States District Court for the Northern District of California, located at the Phillip Burton Federal Building, 450 Golden Gate Avenue, 17th Floor, San Francisco, California 94102, plaintiffs Jennifer Yick, Roland Oosthuizen, Rosemary Mathews, Clara Cajas, Candace Koole, Alan Karam, Azuri Moon, Luis Perez, Vanessa Rivera, Carlos Rodriguez, Stephanie Smith, and Michael Willrich ("Plaintiffs") will and hereby do move the Court pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction ordering Defendant Bank of America, N.A. ("Bank of America" or the "Bank"), and the Bank's officers, directors, agents, employees, representatives, and all persons acting under, in concert or participation with, or for them, to comply with its constitutional, statutory, and common law obligations by doing the following:

1.     Within 10 days of the Court's order, provide an effective means, such as a secure request form on the Bank's website and an email address, by which Class Members may easily initiate or reopen a fraud claim regarding unauthorized transactions in the Class Member's Bank of America EDD Debit Card Account that occurred at any time since January 1, 2020 (the "Class Period") (the "Claim Submission Form");

2.     Within 10 days of the Court's order, provide email, mail, and publication Notice to all Class Members of the availability of the Claim Submission Form;

3.     Upon request, reopen the fraud claim of any Class Member that was closed at any time during the Class Period;

4.     Within 10 days of the Court's order, reopen the fraud claim of any Class Member who has not been permanently credited for the amount of fraud reported during the Class Period and whose Bank of America EDD Debit Card Account was frozen by the Bank based on the Class Member's report of unauthorized transactions on the Account;

5.      Conduct a reasonable and good-faith investigation into each reopened, pending, or new fraud claim reported by a Class Member during the Class Period, which shall be completed within 45 days;

6.      Within one day after completing its investigation of a Class Member's fraud claim, permanently credit the Class Member's EDD Debit Card Account for the full amount of the claim, unless the Bank has affirmative evidence establishing there was no unauthorized transaction and provides documentation of that evidence to the Class Member;

7.      For any investigation that is not completed within 10 days after initiation or reopening, provisionally credit the Class Member's EDD Debit Card Account for the full claim amount pending the Bank's reasonable and good-faith investigation of the claim;

8.      Within 10 days of the Court's order, unfreeze all Class Members' EDD Debit Card Accounts that were frozen by the Bank based on the Class Member's report of unauthorized transactions on the account, unless either the Class Member or the California Employment Development Department ("EDD") requests that the Bank keep the account frozen;

9.      Refrain from freezing any Class Member's EDD Debit Card Account based on the Class Member's report of unauthorized transactions on the account;

10.     Refrain from freezing any Class Member's Bank of America EDD Debit Card Account unless the Bank has first provided the Class Member:

(a) Advance written notice explaining the basis for the intended freeze and explaining that the Class Member has the right to request EDD to issue future benefits payments by paper check instead of by the EDD Debit Card, and

(b) A reasonable opportunity to contest the stated basis for the intended freeze;

11.     Take all necessary measures to ensure that no Class Member who contacts the Bank's customer service hotline to report a fraudulent transaction, to reopen or inquire about the status of a fraud claim, or to inquire about the status of a frozen account, is disconnected, automatically sent to voicemail, or kept on hold for more than a total of five minutes; and

12.     Take all necessary measures to ensure customer service representatives are authorized and equipped, and do, provide meaningful assistance available 24 hours a day, 7 days a week to all Class Members who contact the Bank's customer service hotline to report a fraudulent transaction, to open or inquire about the status of a fraud claim, or to inquire about the status of a frozen account.

Plaintiffs also move for provisional certification, for purposes of the requested preliminary injunction, of a class comprising "All persons who were issued or who used a Bank of America debit card for the purpose of accessing EDD benefits deposited into a Bank of America account, at any time from January 1, 2020 through the present." *See* Consol. Class Action Compl. (Dkt. No. 62) ¶ 185.

Plaintiffs have all been found by EDD to be eligible for unemployment benefits, but have been deprived of those critical, life-sustaining benefits during the pandemic as a result of the Bank's unlawful practices, as described in Plaintiffs' accompanying memorandum of points and authorities ("memorandum"). Plaintiffs move for the requested preliminary injunctive relief on the grounds that they are likely to suffer ongoing and compounding irreparable harm absent immediate injunctive relief, the balance of equities and public interest tip sharply in their favor, and they are likely to succeed on the merits of their claims that: (1) Bank of America's "Fraud Claim Response Practices," as described in Plaintiffs' memorandum, violate the Electronic Fund Transfers Act, 15 U.S.C. §§ 1693-1693r ("EFTA"), Regulation E, 12 C.F.R. Part 1005, the standard contract between the Bank and each class member ("Cardholder Agreement"), provisions of the Bank's contract with EDD intended specifically for the benefit of class members, the implied covenants of good faith and fair dealing, and California's Unfair Competition Law, Bus. & Prof. Code §§17200 et seq. ("UCL"), insofar as they are both unlawful and unfair business practices; and (2) the Bank's "Account Freeze Practices," as described in Plaintiffs' memorandum, violate class members' rights under the Due Process Clauses of the U.S. and California Constitutions, the Cardholder Agreement, the implied covenant of good faith and fair dealing, provisions of the Bank's contract with EDD intended specifically for the benefit

of class members, and the UCL, insofar as they are both unlawful and unfair business practices.

*See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019).

Plaintiffs move for provisional class certification on the grounds that the class is sufficiently numerous, there are ample common questions of law and fact, Plaintiffs' claims are typical of the class's, Plaintiffs are adequate representatives, and certification under Rule 23(b)(2) is appropriate because Plaintiffs at this stage seek only preliminary injunctive relief based on the Bank's practices that are applicable to all Class Members. *See* Fed. R. Civ. P. 23(a); Fed. R. Civ. P. 23(b)(2); *Meyer v. Portfolio Recovery Assoc., LLC*, 707 F.3d 1036, 1041-43 (9th Cir. 2012); *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010).

Plaintiffs' motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the accompanying Declaration of Brian Danitz (with 39 class member declarations attached), the Declaration of Andrew F. Kirtley, the Declaration of Meiriely Amaral, the Joint Declaration of Brian Danitz and Michael Rubin, the Request for Judicial Notice, the proposed order submitted herewith, the pleadings and records on file with the Court, and any further briefing and arguments of counsel.

Dated:  April 1, 2021          **COTCHETT, PITRE & McCARTHY, LLP**

By:   */s/ Brian Danitz*
     BRIAN DANITZ

Dated:  April 1, 2021          **ALTSHULER BERZON LLP**

By:   */s/ Michael Rubin*
     MICHAEL RUBIN

     *Interim Co-Lead Counsel for Plaintiffs*
     *and the Proposed Class*

# TABLE OF CONTENTS

Page (s)

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 1

STATEMENT OF FACTS ....................................................................................................... 1

   I.   The Bank Promised Class Members Fast, Secure Payment of Their EDD Unemployment Benefits, World-Class Customer Service, and Zero Liability for Unauthorized Transactions. .................................................................................................................... 1

   II.  BANA's Mishandling of EDD Cardholders' Fraud Claims During the Pandemic Has Left Thousands of Fraud Victims Unable to Access Their UI/PUA Benefits ............................ 3

   III. The Bank's Practices and Violations Have Caused Serious and Irreparable Harm. .......... 6

LEGAL STANDARD ............................................................................................................... 7

ARGUMENT ............................................................................................................................. 8

   IV.  THE COURT SHOULD GRANT PRELIMINARY INJUNCTIVE RELIEF TO ENSURE THAT ELIGIBLE EDD CLAIMANTS PROMPTLY REGAIN ACCESS TO THEIR PUBLIC BENEFITS FUNDS ........................................................................................... 8

     A.  Plaintiffs Are Likely to Succeed on the Merits, or at Minimum Have Raised Serious Merits Questions. ...................................................................................................... 8

        1.  The Bank's Fraud Claim Response Practices Violate EDD Cardholders' Statutory and Contractual Rights. ...................................................................................... 8

           a. The Bank's Practices Violate the EFTA and Regulation E. ....................... 8

           b. The Bank's Fraud Claim Response Practices Breach the Cardholder Agreement, Class Members' Third-Party Rights Under the EDD-Bank Contact, and the Implied Covenant of Good Faith and Fair Dealing. ............................................................. 10

        2.  The Bank's Suspension of Account Access Without Notice or Opportunity to be Heard Violates Constitutional and Contractual Rights. .............................................. 11

           a. The Bank's Practices Violate Federal and State Due Process. ................................ 11

           i. The Bank Deprived Class Members of Public Benefits Without Adequate Notice or Opportunity to Be Heard .......................................................................................... 11

           ii. The Bank Acted Under Color of State Law. ............................................................. 13

           b. The Bank's Account Freeze Practices Breach the Cardholder Agreement and the Implied Covenant of Good Faith and Fair Dealing. ................................................. 14

           c. The Bank's Practices Violate Class Members' Third-Party Beneficiary Rights Under the EDD-Bank Contract. ............................................................................... 16

        3.  The Bank's Practices Violate the UCL. ................................................................... 18

     B.  The Balance of Equities Tips Sharply in Favor of Plaintiffs and Class Members ......... 19

     C.  An Immediate Injunction is in the Public Interest. ............................................................. 21

     D.  No Bond Should Be Imposed. ............................................................................................ 22

   V.  THE COURT SHOULD PROVISIONALLY CERTIFY THE CLASS ........................... 22

    A.   The Requirements of Rule 23(a) Are Satisfied. ............................................................ 23

    B.   BANA Acted and Refused to Act on Grounds that Apply Generally to the Class. ....... 25

    C.   The Court Should Appoint Co-Lead Counsel as Provisional Class Counsel................. 25

**CONCLUSION** ........................................................................................................................ **25**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*3500 Sepulveda, LLC v. Macy's W. Stores, Inc.*,
980 F.3d 1317 (9th Cir. 2020) ............................................15

*Abdullah v. U.S. Sec. Assocs., Inc.*,
731 F.3d 952 (9th Cir. 2013) ............................................24

*Al Otro Lado v. Wolf,*
952 F.3d 999 (9th Cir. 2020) ............................................23

*Am. Fed. of Labor v. Employment Dev. Dep't,*
88 Cal.App.3d 811 (1979) ..........................................12, 13, 19, 22

*Badie v. Bank of Am.*,
67 Cal.App.4th 779 (1998) ............................................15

*Bank of Am. v. City and County of San Francisco*,
309 F.3d 551 (9th Cir. 2002) ............................................8

*Brown v. Stored Value Cards, Inc.*,
No. 3:15-CV-01370-MO, 2016 WL 4491836 (D. Or. Aug. 25, 2016) ....................14

*Burton v. Wilmington Parking Auth.*,
365 U.S. 715 (1961) ............................................14

*Cahoo v. SAS Analytics Inc.*,
912 F.3d 887 (6th Cir. 2019) ............................................12

*Cahoo v. SAS Inst. Inc.*,
322 F.Supp.3d 772 (E.D. Mich. 2018), *aff'd in part, rev'd in part on other
grounds,* 912 F.3d 887 (6th Cir. 2019) ............................................13

*Cal. Dep't of Human Resources Dev. v. Java*,
402 U.S. 121 (1971) ............................................12, 19

*Camelot Banquet Rooms, Inc. v. U.S. Small Business Admin.*,
458 F.Supp.3d 1044 (E.D. Wis. 2020) ............................................21

*Candelore v. Tinder, Inc.*,
19 Cal.App.5th 1138 (2018) ............................................18

*Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*,
2 Cal.4th 342 (1992) ............................................15

*Cel-Tech Commc'n., Inc. v. L.A. Cellular Tel. Co.*,
 20 Cal.4th 163 (1999) .................................................................................................18

*Cleveland v. Johnson*,
 209 Cal.App.4th 1315 (2012) ......................................................................................11

*Ellis v. Costco Wholesale Corp.*,
 657 F.3d 970 (9th Cir. 2011) .......................................................................................24

*Foley v. Interactive Data Corp.*,
 47 Cal.3d 654 (1988) ...................................................................................................15

*Foss v. Nat'l Marine Fisheries Serv.*,
 161 F.3d 584 (9th Cir. 1998) .......................................................................................12

*Gale v. Hyde Park Bank*,
 384 F.3d 451 (7th Cir. 2004) .........................................................................................9

*Geneva Towers Tenants Org. v. Federated Mortg. Invs.*,
 504 F.2d 483 (9th Cir. 1974) .......................................................................................14

*Goldberg v. Kelly*,
 397 U.S. 254 (1975)......................................................................................................12

*Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*,
 512 F.3d 1112 (9th Cir. 2008) .....................................................................................21

*Goonewardene v. ADP, LLC*,
 6 Cal.5th 817 (2019) ....................................................................................................18

*Gregory v. Albertson's, Inc.*,
 104 Cal.App.4th 845 (2002) ........................................................................................19

*Harvest Rock Church, Inc. v. Newsom*,
 985 F.3d 771 (9th Cir. 2021) .......................................................................................21

*Haskins v. Stanton*,
 794 F.2d 1273 (7th Cir. 1986) .....................................................................................20

*Hauk v. JP Morgan Chase Bank USA*,
 552 F.3d 1114 (9th Cir. 2009) .....................................................................................18

*Hernandez v. Sessions*,
 872 F.3d 976 (9th Cir. 2017) .......................................................................................21

*In re High-Tech Employee Antitrust Litig.*,
 985 F.Supp.2d 1167 (N.D. Cal. 2013) .........................................................................23

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    938 F.3d 985 (9th Cir. 2019) ...........................................................................8

*Jimenez v. Allstate Ins. Co.*,
    765 F.3d 1161 (9th Cir. 2014) ......................................................................24

*Jorgensen v. Cassiday*,
    320 F.3d 906 (9th Cir. 2003) ........................................................................22

*Katzberg v. Regents of Univ. of Cal.*,
    29 Cal.4th 300 (2002) ...................................................................................11

*Lopez v. Heckler*,
    713 F.2d 1432 (9th Cir. 1983) .................................................................21, 22

*Lozano v. AT&T Wireless Servs., Inc.*,
    504 F.3d 718 (9th Cir. 2007) ........................................................................18

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ......................................................................................12

*Meyer v. Portfolio Recovery Assoc., LLC*,
    707 F.3d 1036 (9th Cir. 2012) ......................................................................23

*Oakley v. DeVos*,
    No. 20-cv-03215-YGR, 2020 WL 3268661 (N.D. Cal. June 17, 2020)..................................21

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ...................................................................24, 25

*Rawson v. Recovery Innovations, Inc.*,
    975 F.3d 742 (9th Cir. 2020) ........................................................................13

*Rodriguez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010) ......................................................................13

*Roman v. Wolf*,
    977 F.3d 935 (9th Cir. 2020) ........................................................................23

*Saravia v. Sessions*,
    280 F.Supp.3d 1168 (N.D. Cal. 2017) ..........................................................23

*SEIU v. Options*,
    200 Cal.App.4th 869 (2011) .........................................................................18

*Smith v. State Farm Mutual Auto. Ins. Co.*,
    93 Cal.App.4th 700 (2001) ...........................................................................19

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ................................................................................................23

*California ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*,
  766 F.2d 1319, *as modified by* 775 F.2d 998 (9th Cir. 1985) .................................22

*Washington v. DeVos*,
  466 F.Supp.3d 1151 (E.D. Wash. 2020) ...................................................................21

*West v. Atkins*,
  487 U.S. 42 (1988) .....................................................................................................13

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .........................................................................................................8

*Withrow v. Concannon*,
  942 F.2d 1385 (9th Cir. 1991) ...................................................................................20

*Zepeda Rivas v. Jennings*,
  445 F.Supp.3d 36 (N.D. Cal. 2020) ...........................................................................23

*Zigas v. Superior Court*,
  120 Cal.App.3d 827 (1981) ........................................................................................18

## Statutes

15 U.S.C. § 1693 ....................................................................................................... *passim*

42 U.S.C. §1983 ......................................................................................................11, 13

Cal. Business & Professions Code:
  §17203 ........................................................................................................................18

## Other Authorities

12 C.F.R. Part 1005 (Electronic Fund Transfers [Reg. E]) ...................................... *passim*

Federal Rules of Civil Procedure:
  Rule 23 ............................................................................................................23, 24, 25
  Rule 65(c) ...................................................................................................................22

## MEMORANDUM OF POINTS AND AUTHORITIES

Millions of Californians who lost their jobs during the COVID-19 pandemic rely on unemployment insurance and similar benefits to pay for food, housing, and the necessities of life. This case involves tens of thousands of those Californians who suffered the double indignity, *after* losing their jobs and livelihoods, of (1) having their public benefits funds stolen from their Bank of America-administered debit card accounts and (2) after reporting those thefts to Bank of America ("BANA" or "Bank"), having the Bank freeze their accounts, depriving them of access to previously paid *and* ongoing benefits, without notice, an opportunity to be heard, or provisional or permanent reimbursement of the stolen funds. Preliminary injunctive relief is required to remedy the immediate and irreparable harms caused by this wrongdoing, which violates the Bank's obligations under the Electronic Fund Transfers Act, 15 U.S.C. §§ 1693-1693r ("EFTA"), its implementing regulations, 12 C.F.R. Part 1005 ("Regulation E"), due process, and multiple provisions of California law.[1]

The accompanying declarations detail the devastating consequences of the Bank's misconduct. The challenged policies and practices have plunged plaintiffs and class members into a cascading series of financial and personal horrors, causing many to be unable to pay their rent, car payments, phone and utility bills, childcare, and medical bills, while struggling to feed themselves and their families. By this motion, plaintiffs seek (1) a preliminary injunction order directing the Bank to comply with its legal obligations as set forth below, and (2) an order provisionally certifying a Rule 23(b)(2) class as defined *infra* at 23.

## STATEMENT OF FACTS

**I.      The Bank Promised Class Members Fast, Secure Payment of Their EDD Unemployment Benefits, World-Class Customer Service, and Zero Liability for Unauthorized Transactions.**

The California Employment Development Department ("EDD") is the state agency responsible for administering Unemployment Insurance ("UI"), Pandemic Unemployment

---

[1] Although the Bank's own lax practices (including its use of outmoded "magnetic stripe" technology and its failure to safeguard class members' confidential data) enabled much of that fraud to occur, *see* Consolidated Class Action Complaint ("CAC") at ¶¶40-53, those independently actionable practices are not at issue in the present motion for preliminary injunction.

Assistance ("PUA"), and other public benefits programs. In 2010 (and again in 2015 upon renewal), EDD awarded BANA an exclusive contract to become EDD's Electronic Benefits Payment provider and thus responsible for disbursing these public benefits through BANA-branded debit cards ("EDD Debit Cards") linked to claimants' EDD-funded benefits accounts. Dec. of Andrew Kirtley ("Kirtley Dec."), Exhibits 1, 2. BANA's EDD Debit Cards are the default payment method for eligible claimants to receive public benefits. *Id.*; Dec. of Meiriely Amaral ("Amaral Dec."), Exhibits 4 & 5 (EDD website: "Benefit payments … are all made using the EDD Debit Card.").

In exchange for becoming EDD's exclusive payment provider, the Bank made numerous commitments to protect benefits claimants. Particularly relevant here, the Bank promised to protect claimants from fraud, to promptly and fully investigate any claims of fraud, to hold account holders harmless in the event of fraud, and to provide provisional credit to claimants whenever the Bank could not complete a good faith investigation without 10 days. *See infra* at 8-9.[2] The Bank also committed to provide "[s]uperb customer service" to ensure that all claims or inquiries from benefits recipients would be promptly addressed and resolved by the Bank's Customer Service Representatives ("CSRs"). Kirtley Dec. Exhibit 2 at 6[3]; *see infra* at 16.[4] The

---

[2] For example, the Bank represented that it would provide "industry best-in-class" fraud investigations services, "applying specialized processes and tools to resolve fraud." Kirtley Dec. Exhibit 2 at 80 (Req. #412); *see also id.* at 81-82 (Req. #413); *id.* at 6, 19, 37. The Bank also committed to hold class members harmless from fraudulent transactions, promising that "[a]ll Regulation E requirements and timelines [will be] followed" and that class members "should feel comfortable in dealing with disputed transactions knowing that we extend our Zero Liability protection on dispute claims, including ATM and pinned POS transactions." *Id.* at 63 (Req. #245). Further, the Bank promised that in the event of a fraudulent or otherwise unauthorized transaction, the Bank's error resolution process would enable customers to call the Customer Service Center and "immediately speak with a live representative," that any errors would be "promptly correct[ed]" within 10 days or, "[i]f more time is needed, we will temporarily credit the cardholder's account within 10 business days of the initiated dispute for the full disputed amount," without any "limitation or maximum." *Id.*

[3] Page citations to Exhibit 2 to the Kirtley Declaration refer to the Bates-stamped numbers.

[4] BANA also assured, "Long call hold waits and busy signals are not tolerated at Bank of America. Your program's average speed of answer is 30 seconds and your average handle time is 230 seconds." Kirtley Dec. Exhibit 2 at 24; *see also id.* at 57, 64-69, 88. BANA contracted to provide an Interactive Voice Response system and live CSR support "[7] days a week, [24] hours per day," *id.* at 48, 52, 54 (Reqs. #201, 224, 231); *id.* at 40, and promised that live CSR agents would be available 24/7 to assist Account holders with "[i]nvestigat[ing] transactions" (fraud security, use), "[p]rocess[ing] lost/stolen/damaged card reports," and "resolv[ing] [claimants'] problems." *Id.* at

Bank then reiterated the most critical of these promises—including its commitment to strictly comply with the EFTA's Regulation E, the Bank's own Zero Liability policy, and its guarantee of prompt 24/7 access to live CSR agents—in its Cardholder Agreements and other representations to plaintiffs and class members. Amaral Dec. Exhibit 1 (Cardholder Agreement) and Exhibit 2 (Bank's FAQ website); Kirtley Dec. Exhibit 2 at 86.

## II.   BANA's Mishandling of EDD Cardholders' Fraud Claims During the Pandemic Has Left Thousands of Fraud Victims Unable to Access Their UI/PUA Benefits.

During the past year, enormous sums of money have been stolen by unauthorized third parties from the EDD Debit Card accounts of plaintiffs and class members. The accompanying 39 declarations provide tip-of-the-iceberg examples of class members whom EDD found eligible for public benefits, who received those funds through EDD Debit Cards, and who fell victim to third-party fraud, often losing thousands of dollars despite never yielding physical possession of their cards or authorizing third-party access. *See* Exs. 1-39.[5] News reports and legislative hearings suggest that tens if not hundreds of thousands of EDD Debit Card holders were victimized by fraud.  *See, e.g.*, Amaral Dec. Exhibit 7 at 1, 3-4, 6-8; *id.* Exhibits 12, 13.

The Bank is legally required to promptly and reasonably investigate any report of unauthorized transactions within 45 days of receipt, to reimburse each claimant whose fraud claim is valid, and to provide "provisional credit" to any claimant if the Bank's "good faith" investigation takes more than 10 days to complete. *See infra* at 8-9. Instead, the Bank, acting in its own economic self-interest and in derogation of claimants' statutory, contractual, constitutional, and common law rights, summarily denied fraud claims without investigation and promptly froze the accounts of claimants who reported fraud, preventing them from accessing previously received as well as future benefits payments—without notice, a pre-termination opportunity to be heard, or any justification. The Bank then stymied those claimants' efforts to

---

40, 48. BANA also promised that "no call [would be] transferred to voicemail or automatically disconnected from the queue," *id.* at 52 (Req. #203), that "calls [would] not [be] immediately placed on hold," *id.* (Req. #204), that "the average wait time to speak to a live CSR" would be "no more than 30 seconds for [] 70 percent of the calls, and no more than two (2) minutes for all calls," *id.* at 54 (Req. #226), and that it would "monitor Customer Service calls to ensure quality service and address Customer complaints," *id.* at 87 (Req. #504).

[5] "Ex." refers to exhibits to the Declaration of Brian Danitz filed concurrently herewith.

obtain the Bank's help in resolving their fraud claims and restoring their wrongfully frozen

accounts, forcing them to wait on hold for hours, often disconnecting calls in progress, and

having its CSRs routinely give claimants false and inconsistent information, purport to be unable

to provide assistance or falsely shift blame for the frozen account onto EDD. Ex. 28 (Suchomel

Dec.) ¶¶8-9; Ex. 22 (Polk Dec.) ¶8; Ex. 8 (Choi Dec.) ¶8. Ex. 21 (Peters Dec) ¶10.

Most class members who filed reports of fraud received a form letter from the Bank,

dated the same day as (or within a day or two of) the report, stating without further explanation:

> Your claim has been closed because we believe the account or the claim have
> been the subject of fraud or suspicious activity. Any temporary credit that was
> applied to your account related to this claim, including any related
> reimbursement of fees, has been or will be debited from your account and
> reflected in your available balance, if any.

Ex. 20 (Oosthuizen Dec) ¶5 and Exhibit A; Ex. 16 (Ly Dec.) ¶¶7-8; Ex. 6 (Cajas Dec.) ¶¶6-7;

Ex. 8 (Choi Dec.) ¶¶6-7; Ex. 24 (Rivera Dec.) ¶9; Ex. 29 (Thomas Dec.) ¶¶7-8; Ex. 33

(Yaccarino Dec.) ¶¶7-8; Ex. 7 (Carey Dec.) ¶¶7-9; Ex. 26 (Schmitt Dec.) ¶¶6-8; Ex. 10 (Desu

Dec.) ¶7; *see* Amaral Dec. Exhibit 7 at 7-8.[6] If the claimant attempted to reopen the claim and

submit supporting documentation, the Bank often failed to respond for months and then

misdirected or gave erroneous information to claimants regarding their claims' status.[7]

Instead of conducting the "good faith" investigations required by law, the Bank treated

class members as the criminals, summarily freezing accounts without prior notice, explanation,

or a mechanism for challenging the freeze. Ex. 3 (Alvarez Dec.) ¶¶7-8; Ex. 7 (Carey Dec.) ¶7;

Ex. 24 (Rivera Dec.) ¶¶9-10; Ex. 8 (Choi Dec.) ¶7; Ex. 14 (Koole Dec.) ¶7; Ex. 16 (Ly Dec.)

¶¶6-8; Ex. 26 (Schmitt Dec.) ¶¶7-8; Ex. 25 (Rodriguez Dec.) ¶8; Ex. 29 (Thomas Dec.) ¶¶7-8;

Ex. 32 (Willrich Dec.) ¶8; Ex. 33 (Yaccarino Dec.) ¶¶7-8. Even when the Bank led claimants to

believe it was protecting them from future fraud by issuing them a new debit card with a new

---

[6] Some class members who reported fraudulent transactions earlier in the pandemic had their
claims initially resolved in their favor, but months later reversed. Without warning or explanation,
the Bank *debited* the previous "permanent" credit from their accounts, often leaving their accounts
with a negative balance. *See, e.g.,* Ex. 11 (Fazio Dec.) ¶¶13-18, 20; Ex. 37 (Ayala Dec.) ¶¶9-15.
[7] Ex. 31 (Veronneau Dec.) ¶13 (never received response to faxed requests); Ex. 30 (Vela Dec.) ¶9
(never reopened despite police report); Ex. 21 (Peters Dec.) ¶10 (contradictory and false
information); Ex. 26 (Schmitt Dec.) ¶9 (Bank "did not have access" to account or Bank's letter).

number—a measure designed to prevent third-party fraud against the cardholders—the Bank immediately rendered the new card useless by again freezing the claimants' accounts, thus preventing account holders from regaining access to their own public benefits funds. Ex. 24 (Rivera Dec.) ¶¶ 9-10; Ex. 5 (Bulvas Dec.) ¶ 8; Ex. 3 (Alvarez Dec.) ¶ 9; Ex. 16 (Ly Dec.) ¶8; Ex. 21 (Peters Dec.) ¶8; Ex. 35 (Zamora Dec.) ¶7.

Sometimes, but not always, the Bank provided notice of the freeze long after the fact, for example by stating (again without explanation), "It has been determined that there may be irregular, unauthorized, or unlawful activities involved with the prepaid debit card issued to you. As a result, … a freeze (or hold) has been placed on your account." Ex. 17 (Mathews Dec.) Exhibit C. The Bank never explained what steps, if any, claimants could take to regain access to their funds, even though the Bank's notices states, "[i]f a conclusion is reached that there is no irregular, unauthorized, or unlawful activity on your account, your account will be unfrozen and your balance will become available in accordance with the terms of the card account agreement and state agency guidelines." *Id*.

Once an EDD Debit Card account is frozen, it becomes nearly impossible for the card-holder to get it unfrozen—causing class members to suffer the consequences of being deprived of essential benefits, past and future, for months on end. Ex. 7 (Carey Dec.) ¶¶6, 11 (over 6 weeks); Ex. 16 (Ly Dec.) ¶¶8-9 (over 2 months); Ex. 22 (Polk Dec.) ¶¶7, 10 (3 months); Ex. 24 (Rivera Dec.) ¶¶10-11 (5 weeks); Ex. 35 (Zamora Dec.) ¶¶6-7, 10 (over 2 months); Ex. 36 (Perez) ¶13 (over 3 months). The resulting emotional and financial stress is exacerbated by the Bank's grossly inadequate customer service procedures. Ex. 30 (Vela Dec.) ¶11 ("no timeline"); Ex.10 (Desu Dec.) ¶12 (no information about "how long it will take to reopen my account and resume the fraud investigation"); Ex. 8 (Choi Dec.) ¶8 (Bank "inevitably tells me that all I can do is wait"); Ex. 16 (Ly Dec.) ¶9 ("no estimated timeline"); Ex. 29 (Thomas Dec.) ¶9; *see also* Ex. 21 (Peters Dec.) ¶10 (told by CSR: "The more you call, the longer it will take to process.").

The Bank routinely informs claimants, falsely, that EDD (not the Bank) was responsible for freezing their account and that they must contact EDD to get their account unfrozen. Ex. 30

(Vela Dec.); Ex. 21 (Peters Dec.); Ex. 10 (Desu Dec.); Ex. 9 (Crawford Dec.); Ex. 15 (LaFaye Dec.). Many class members who manage to reach EDD are told that the agency has no problem with their eligibility and did not order their accounts to be frozen. Ex. 7 (Carey Dec.) ¶10 (EDD rep "was not aware of any issues with my account and told me that 'everything was good on their end.'"); Ex. 15 (LaFaye Dec.) ¶10 (EDD rep "told me that the agency never told anyone to freeze my card"); Ex. 9 (Crawford Dec.) ¶12; Ex. 10 (Desu Dec.) ¶11; Ex. 33 (Yaccarino Dec.) ¶9; Ex. 14 (Koole Dec.) ¶9; Ex. 38 (Haynes Dec.) ¶8. Indeed, EDD makes clear on its website that in a case of an actual *EDD-initiated* freeze (unlike Bank-initiated freezes at issue here), the EDD sends the claimant an "email, text message, or mailed notice requesting identity verification documents" and states, "If you can't access funds on your debit card or funds have been reduced and you have not received any messages from the EDD, it's likely that *Bank of America has frozen or suspended the card*. … In this case, the EDD does not need to verify your identity and suggests that *you contact Bank of America*." Amaral Dec. Exhibit 6 at 3 (emphasis added).

### III.   The Bank's Practices and Violations Have Caused Serious and Irreparable Harm.

For many class members, in particular those who struggle to cover basic needs like housing, food, utility bills, and other expenses necessary for survival and basic dignity, the consequences of the Bank's malfeasance have been catastrophic. *See, e.g.*, Ex. 15 (LaFaye Dec.) ¶11 ("trouble paying rent" and "received a shutoff notice last month" for past due water bills); Ex. 22 (Polk Dec.) ¶9 ("lost my car, pawned many of my belongings, and expect to lose access to my utilities and phone services soon"); Ex. 19 (Moon Decl.) ¶12 (lost housing and had to live in car for a month); Ex. 5 (Bulvas Dec.) ¶10 (no "money left for food or to pay for my car and cell phone" after paying rent); Ex. 31 (Veronneau Dec.) ¶18 (similar); Ex. 24 (Rivera Dec.) ¶14 ("I had to break my son's piggy bank so we could have money for food."); Ex. 14 (Koole Dec.) ¶13 (single mother "living week to week, rationing out food for my child").

The Bank's practices undermine one of the core purposes of UI benefits by making it harder for recipients to seek employment (because dealing with the Bank to regain their benefits can be so extraordinarily time consuming and because of the difficulty of searching for work

without being able to pay for basic needs like a phone, car, housing, or food. *See, e.g.*, Ex. 8 (Choi Dec.) ¶9; Ex. 24 (Rivera Dec.) ¶14 (no money for gas or transportation, "so going to a job interview is currently impossible"); Ex. 33 (Yaccarino Dec.) ¶11 (phone service cut off, "hindering my ability to apply for jobs"); Ex. 35 (Zamora Dec.) ¶11 (car broken and needs repairs, so "I have had to cancel job interviews for lack of transportation").

Class members have suffered many other collateral consequences as well, including accumulating debt and sharply reduced credit scores as well as the relentless anxiety that comes from severe financial insecurity. *See, e.g.*, Ex. 19 (Moon Dec.) ¶12 ("significant late fees and excessive interest building up"); Ex. 29 (Thomas Dec.) ¶11 ("maxed out all my wife's and my credit cards trying to stay afloat"); Ex. 21 (Peters Dec.) ¶13 (credit score dropped from high 700s to 500s because all credit cards "maxed out"); Ex. 30 (Vela Dec.) ¶12 ("sleepless nights thinking about how to pay for food, rent, and bills"); Ex. 21 (Peters Dec.) ¶13 ("collection agency will be contacting me soon"); Ex. 14 (Koole Decl.) ¶13 ("every day I wonder if I will soon be homeless"). The loss of employment, followed by the stress of being a victim of fraud and then the victim of the Bank's false promises, coupled with the uncertainty about future benefits payments, has been emotionally crushing for many class members. Ex. 7 (Carey Dec.) ¶12 ("absolute nightmare"); Ex. 24 (Rivera Dec.) ¶14 ("situation has left me so desperate"); Ex. 35 (Zamora Dec.) ¶11 ("devastating"); Ex. 15 (LaFaye Dec.) ¶11 ("tremendous amount of stress and headaches"); Ex. 31 (Veronneau Dec.) ¶18 ("The frustration of not being able to get any answers from Bank of America has just destroyed me. I have zero recourse.").

## LEGAL STANDARD

A preliminary injunction should issue if the moving parties establish they are: (1) "likely to succeed on the merits"; (2) "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the Ninth Circuit's "'sliding scale' approach to these factors, … when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious questions going to the

merits.'" *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1135 (9th Cir. 2011)).

## ARGUMENT

**IV.   THE COURT SHOULD GRANT PRELIMINARY INJUNCTIVE RELIEF TO ENSURE THAT ELIGIBLE EDD CLAIMANTS PROMPTLY REGAIN ACCESS TO THEIR PUBLIC BENEFITS FUNDS**

### A. Plaintiffs Are Likely to Succeed on the Merits, or at Minimum Have Raised Serious Merits Questions.

#### 1. The Bank's Fraud Claim Response Practices Violate EDD Cardholders' Statutory and Contractual Rights.

During the class period, the Bank has systematically failed to conduct good-faith investigations into class members' fraud claims, summarily denied those claims without reasonable basis or written explanation, failed to provide provisional credit pending good faith investigations, and failed to reimburse claimants for funds stolen from their EDD Debit Card accounts (collectively "Fraud Claim Response Practices"). *See supra* at 3-6. These practices violate plaintiffs' and class members' rights under the EFTA and Regulation E, and the "Zero Liability" guarantee under the Cardholder Agreement and the EDD-Bank Contract.

a.   The Bank's Practices Violate the EFTA and Regulation E.

Congress enacted EFTA to protect consumers, given the known vulnerability of debit cards and other electronic payment systems to "fraud, embezzlement, and unauthorized use [compared to] traditional payment methods." H.R. Rep. No. 1315, 95th Cong., 2d Sess. 2 (1978); *see* 15 U.S.C. § 1693(b); *Bank of Am. v. City & Cnty. of S.F.*, 309 F.3d 551, 564 (9th Cir. 2002). The EFTA and Regulation E impose affirmative obligations on financial institutions like BANA to promptly investigate and resolve consumer claims of fraud and to limit consumer liability for "unauthorized electronic fund transfer[s]." 15 U.S.C. §§1693a(12), 1693f, 1693g; 12 C.F.R. §§1005.6, 1005.11. When a consumer reports an unauthorized transaction, EFTA Section 1693f(a) requires the bank to "investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days." 15 U.S.C. §1693f(a); *see* 12 C.F.R. §1005.11(c)(1). If the bank

determines there was an error, it must correct it within one business day. 15 U.S.C. §1693f(b); *see* 12 C.F.R. §1005.11(c)(1). If the bank finds no error, it must "deliver or mail to the consumer an explanation of its findings within 3 business days after the conclusion of its investigation," 15 U.S.C. §1693f(d), and inform the consumer of her "right to request the documents that the institution relied on in making its determination," 12 C.F.R. §1005.11(d)(1). If unable to complete its investigation within 10 days, the bank must "provisionally recredit the consumer's account for the amount alleged to be in error … pending the conclusion of its investigation and its determination of whether an error has occurred," and must complete that investigation within 45 days of the fraud report, during which time "the consumer shall have full use of the funds provisionally recredited." 15 U.S.C. §1693f(c); 12 C.F.R. §1005.11(c)(2).

BANA did not comply with *any* of these provisions after plaintiffs and other class members reported that funds had been stolen from their EDD Debit Card accounts. The declarations show that BANA opens and closes fraud claims so quickly that it could not possibly conduct full, good-faith investigations. Ex. 1 (Aceves Dec.) ¶11; Ex. 4 (Amateau Dec.) ¶ 8; Ex. 16 (Ly Dec.) ¶¶6-8; Ex. 24 (Rivera Dec.) ¶9; Ex. 26 (Schmitt Dec.) ¶¶6-8. Moreover, the Bank's claim denial letters contain only boilerplate claim-denial language that fails to describe "the results of [its] investigation" or an "explanation of [its] findings." 15 U.S.C. §1693f(a), (d); 12 C.F.R. §1005.11(c)(1), (d)(1); *see Gale v. Hyde Park Bank*, 384 F.3d 451, 453 (7th Cir. 2004) (plaintiff stated valid claim under Section 1693f by alleging "the Bank rejected his claim without much explanation," thus providing "a 'determination' but not 'the results of such investigation'"). Even when claimants submit detailed substantiating documentation, the Bank *still* fails to issue credit for months on end. *See supra* at 4 & n.6. The record thus demonstrates BANA's practice of summarily denying fraud claims without conducting a "good faith investigation of the alleged error" and without "a reasonable basis for believing that the consumer's account was not in error," in violation of EFTA and Regulation E. 15 U.S.C. §1693f(e).

By statute and by contract, BANA (rather than EDD or the claimant) is responsible for the financial consequences of any fraud committed against a cardholder. Kirtley Dec. Exhibit 2

at 74 (Req. #337). That obligation is at the root of the Bank's challenged policies and practices. The Bank evidently adopted its practice of automatically and summarily denying cardholders' fraud claims (and applied this practice retroactively to rescind credits previously awarded to cardholders) to protect *itself* from the risk that criminals might seek to "take[] advantage of" the Bank's obligation to provide provisional credit pending fraud investigations. Amaral Dec. Exhibit 11 at 5-6; *see id.* Exhibit 9 at 4 (noting that the Bank's Regulation E obligation to provide provisional credit "is a very significant element of the Bank's operating expenses"). The Bank's practice of failing to reimburse victims of third-party fraud, conduct good faith investigations into allegations of fraud (which would require the Bank to provide provisional credit whenever an investigation took more than 10 days), or provide any meaningful customer service access for fraud victims has enabled the Bank to avoid having to pay millions of dollars to class members—money many of them need for day-to-day survival.

The Bank cannot be allowed to transfer the costs of its legal obligations to innocent cardholders. It *should* have fulfilled its obligations by conducting prompt and thorough investigations of each fraud claim (and by hiring and training additional staff to do so). Instead, it decided to presume that all claims of fraud were themselves fraudulent, ignoring that application of this unlawful presumption prevents legitimate claimants from accessing public benefits funds that may be essential to their survival. In short, the Bank chose to prioritize its own financial interests above the needs of its cardholders when they were most financially vulnerable.

  b. <u>The Bank's Fraud Claim Response Practices Breach the Cardholder Agreement, Class Members' Third-Party Rights Under the EDD-Bank Contact, and the Implied Covenant of Good Faith and Fair Dealing.</u>

The Bank's Fraud Claim Response Practices also violate the express terms of its Cardholder Agreement with class members (which incorporate the protections of the EFTA and Regulation E and guarantee "Zero Liability" for unauthorized transactions) and the implied covenant of good faith and fair dealing. Amaral Dec. Exhibit 1 at 6-7 ("Under the Bank of America 'zero liability' policy, you may incur no liability for unauthorized use of your Card up to the amount of the unauthorized transaction, provided you notify us within a reasonable time

[(which shall "not be less than the time frames specified under the Electronic Fund Transfer Act or Regulation E")] of the loss or theft of your Card, Card number or PIN or its unauthorized use …."). Compliance with Regulation E and the "Zero Liability" policy protecting EDD Cardholders are also express requirements of the Bank's contract with EDD. *See* Kirtley Dec. Exhibit 2 at 42-44, 63 (Req. #245), 71 (Req. #304), 74 (Req. #334), 77. Plaintiffs and class members are third-party beneficiaries entitled to enforce those provisions. *See infra* at 16-18.[8]

## 2. The Bank's Suspension of Account Access Without Notice or Opportunity to be Heard Violates Constitutional and Contractual Rights.

The Bank's practice of automatically freezing the accounts of claimants who report fraud, without providing notice or any meaningful pre- or post-deprivation opportunity to be heard (including by not providing meaningful post-deprivation access to its CSRs, collectively, "Account Freeze Practices," *see supra* at 4-6) violates class members' rights under the Due Process Clauses of the U.S. and California Constitutions, the Cardholder Agreement, the implied covenant of good faith and fair dealing, and provisions of the Bank's contract with EDD that are intended specifically for the benefit of those claimants.

### a.   The Bank's Practices Violate Federal and State Due Process.

The Due Process Clause of the 14th Amendment prohibits state deprivations of property without due process of law and is enforceable through 42 U.S.C. §1983. The California Constitution guarantees due process in art. I, §7(a), and is self-executing. *Katzberg v. Regents of Univ. of Cal.*, 29 Cal.4th 300, 307 (2002). Because BANA stripped class members who reported fraud of their constitutionally protected property interest in UI and PUA benefits without adequate notice or meaningful opportunity to be heard and did so while acting "under color of law," plaintiffs are likely to prevail on the merits of their due process claims.

### i.   The Bank Deprived Class Members of Public Benefits Without Adequate Notice or Opportunity to Be Heard.

A procedural due process claim requires plaintiffs to establish "(1) a protect[ed] liberty or

---

[8] The Bank's practices also breach its fiduciary obligations to class members as the sole financial institution authorized to implement EDD's benefits programs, which class members have no choice but to use. See CAC ¶¶257-263, 271-286; *Cleveland v. Johnson*, 209 Cal.App.4th 1315, 1338-41 (2012).

property interest … and (2) a denial of adequate procedural protections." *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 588 (9th Cir. 1998) (citation omitted). The "unemployment insurance benefits" at issue are "a type of property interest protected by the due process clause." *Am. Fed. of Labor v. Employment Dev. Dep't ("AFL")*, 88 Cal.App.3d 811, 820 (1979); *see Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) ("Relevant constitutional restraints apply as much to the withdrawal of public assistance benefits as to [the] disqualification for unemployment compensation[.]") (citing *Sherbert v. Verner*, 374 U.S. 398 (1963)); *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 900 (6th Cir. 2019). The class members' EDD Debit Card accounts are not ordinary consumer bank accounts. They exist solely by virtue of the Bank's contract with EDD, which gives BANA the exclusive right to distribute the public benefits provided by EDD, and hold exclusively public benefits payments. Kirtley Dec. Exhibit 2 at 1-2, 42, 70, 72 (Req. #315).

BANA's practice of automatically freezing the accounts of benefits recipients who report fraud, without advance notice or a pre-freeze opportunity to be heard, deprives those claimants of adequate procedural protections. To determine what process is due, courts consider the interests of the affected individuals and the government, the risk of erroneous deprivation through the procedures provided, and the value of additional or substitute safeguards. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (citing *Goldberg*, 397 U.S. at 263-71). Weighing these factors, the Supreme Court has held that the 14th Amendment prohibits terminating welfare payments without first providing "timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." *Goldberg*, 397 U.S. at 267-68; *see AFL*, 88 Cal.App.3d at 819, 820 n.5 (extending *Goldberg* to UI benefits under California Constitution, and requiring *pre*-termination notice and hearing); *Cal. Dep't of Human Resources Dev. v. Java*, 402 U.S. 121, 131-32 (1971) (emphasizing critical importance of prompt payment of UI benefits, which "serv[e] to maintain the recipient at subsistence levels without the necessity of his turning to welfare or private charity.").

BANA's practice of freezing the accounts of class members who report unauthorized fraudulent transactions without providing them notice, an opportunity to be heard *before* the freeze, or even any meaningful opportunity to be heard *after* the freeze, violates due process. Although discovery in these consolidated cases has not yet begun, dozens of class members have submitted sworn declarations demonstrating that they have been unable to get their accounts unfrozen, and that when they tried to reach a Bank CSR, they were either placed on hold for hours (and gave up or were disconnected) or, if they persevered, were falsely told that BANA could not unfreeze the account and that they should contact EDD.[9] Even after some Cardholders managed to contact EDD and EDD confirmed their eligibility for continuing UI benefits, BANA *still* did not unfreeze their accounts.[10]

### ii.   The Bank Acted Under Color of State Law.

A private party that performs a "public function" or engages in "joint action" with a government entity can be held liable under 42 U.S.C. §1983 for committing due process violations "under color of state law." *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 747 (9th Cir. 2020); *id.* at 753 (government cannot "contract away its constitutional duties by having private actors rather than state actors perform some of the work.") (cleaned up); *West v. Atkins*, 487 U.S. 42, 56 (1988). BANA performed a public function by distributing, freezing, and otherwise controlling the class members' access to their UI and PUA funds. *See Rawson*, 975 F.3d at 748; *Cahoo v. SAS Inst. Inc.*, 322 F.Supp.3d 772, 793 (E.D. Mich. 2018), *aff'd in part, rev'd in part on other grounds,* 912 F.3d 887 (6th Cir. 2019) ("administration of unemployment benefits is a power traditionally exclusively reserved to the State."); *Brown v. Stored Value Cards, Inc.*, No. 3:15-CV-01370-MO, 2016 WL 4491836, at *2 (D. Or. Aug. 25, 2016), *rev'd*

---

[9] BANA gave this advice despite knowing that EDD's overwhelming backlog meant that most would be unable to get through. *See* Amaral Dec. Exhibit 10 at 39, 55-56 (Audit Report) (in July 2020, EDD agents answered just 1.4% of all calls; in October, just 6.3% of all calls).

[10] Ex. 7 (Carey Dec.) ¶10; Ex. 13 (Hirschmann Dec.) ¶¶9, 12; Ex. 14 (Koole Dec.) ¶11; Ex. 29 (Thomas Dec.) ¶9. Even the few who are able to reach a CSR, are then able to reach EDD, are successful in persuading EDD that the Bank wrongfully stripped them of benefits to which they are entitled, and then receive a paper check from EDD, are not made whole because only the Bank can refund the stolen funds (and even a lump sum payment to a claimant deprived of continuing benefits would not make that claimant whole, *see AFL*, 88 Cal.App.3d at 821).

*and rem'd on other grounds*, 953 F.3d 567, 575 (9th Cir. 2020) (private company responsible for returning released inmates' funds through prepaid debit cards performs public function).

BANA also engaged in joint action through its exclusive contract with EDD to provide and administer UI and PUA benefits. *See Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 724-25 (1961); *Geneva Towers Tenants Org. v. Federated Mortg. Invs.*, 504 F.2d 483, 487 (9th Cir. 1974). The EDD-Bank Contract contains an express revenue-sharing arrangement, thereby creating mutual benefit as well as financial interdependence. Kirtley Dec. Exhibit 2 at 1, 89-98, 100-04. Joint action is also established by the fact that EDD designated EDD Debit Cards as the default method for eligible claimants to receive benefits payments. *See* Amaral Dec. Exhibit 4; *id.* Exhibit 5 at 2; *id.* Exhibit 6 at 1 (promoting EDD Debit Card as "a fast, convenient, and secure way to get your benefit payments ….."); *Brown*, 2016 WL 4491836, at *3.

> b. The Bank's Account Freeze Practices Breach the Cardholder Agreement and the Implied Covenant of Good Faith and Fair Dealing.

The Bank's Account Freeze Practices also breach the Cardholder Agreement and the implied covenant of good faith and fair dealing. The Bank's Cardholder Agreements permit the Bank to freeze an account only under specified circumstances. In attempting to justify its freezing of tens of thousands of EDD Debit Card accounts, the Bank has relied on a provision of the Cardholder Agreement allowing the Bank to freeze an account if the Bank "suspect[s] irregular, unauthorized, or unlawful activities may be involved … pending an investigation of such suspected activities." Amaral Dec. Exhibit 1 at 2; *see, e.g.*, Ex. 17 (Mathews Dec.) Ex. C (freeze letter). But this provision only enables the Bank, upon identifying potentially unauthorized transactions through its fraud-detection systems, to freeze an account to protect it from being further compromised if the associated debit card has been lost or stolen, and only for a time-limited period while the Bank reasonably investigates, including by providing the cardholder an opportunity to confirm that the disputed transactions were, in fact, unauthorized.

The Bank's purpose in unilaterally freezing the accounts of class members *after* they report unauthorized transactions is not to protect those claimants from further fraud, but to further its own economic self-interest and to evade its legal obligations under EFTA/Regulation

E, while reaping the benefit of retaining all frozen funds. *See supra* at 10; Amaral Dec. Exhibit 9 at 3-4 (Bank earns interest on "funds loaded onto the [EDD Debit Cards while] they remain unspent by cardholders").[11] Moreover, BANA often does not even provide notice when it freezes a claimant's account (or it provides notice only months later), notwithstanding its contractual obligation to provide notice upon freezing an account. *See* Amaral Dec. Exhibit 1 at 2; *id.* Exhibit 7 at 5 (admitting the Bank initially did not provide *any* notice to cardholders whose accounts it froze); Ex. 6 (Cajas Dec.) ¶7; Ex. 18 (Moreno Dec.) ¶ 6; Ex. 35 (Zamora Dec.) ¶7; Ex. 36 (Perez Dec.) ¶9; Ex. 38 (Haynes Dec.) ¶8. BANA also keeps those freezes in effect indefinitely, even when EDD has confirmed the claimant is entitled to the frozen benefits. Ex. 7 (Carey Dec.) ¶10; Ex. 13 (Hirschmann Dec.) ¶¶9, 12; Ex. 14 (Koole Dec.) ¶11; Ex. 29 (Thomas Dec.) ¶9. These practices violate the Cardholder Agreement on its face, including promises that BANA "*will add funds to your Account … in accordance with instructions from the EDD*" and that "[*f*]*unds are available for your use on the day we have been instructed by the EDD to fund your Account.*" Amaral Dec. Exhibit 1 at 1 (emphasis added). They also breach the Bank's fiduciary duties.

In California, there is "an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 684 (1988) (quotations and citation omitted). A party can breach the covenant without breaching a specific provision of the contract. *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal.4th 342, 373 (1992). The key question "is whether the party's conduct … frustrates the other party's rights to the benefits of the contract." *3500 Sepulveda, LLC v. Macy's W. Stores, Inc.*, 980 F.3d 1317, 1324 (9th Cir. 2020) (cleaned up). Where, as here, "'one party is invested with a discretionary power affecting the rights of another,'" that party "must exercise such power in good faith and through 'objectively reasonable conduct.'" *Id.* (quoting *Carma Devs.*, 2 Cal.4th at

---

[11] *See* Ex. 8 (Choi Dec.) ¶ 7 (nearly $20,000 in frozen account); Ex. 7 (Carey Dec.) ¶11 (over $20,000 in frozen account); Ex. 22 (Polk Dec.) ¶ 7 (about $4,000 in frozen account); Ex. 35 (Zamora Dec.) ¶10.

372, and *Badie v. Bank of Am.*, 67 Cal.App.4th 779, 796 (1998)).

The purpose of the EDD Debit Card is to allow class members to access their public UI and PUA benefits. The purpose of the contractual "freeze and notice" provisions is to *protect claimants* from future unauthorized transactions, not to deny them access to the public benefit funds for which they have been found eligible. The implied covenant does not permit BANA to deny cardholders access to their EDD benefits by freezing their accounts without notice, reasonable suspicion of fraud, and a good faith investigation. *See Badie*, 67 Cal.App.4th at 796-97 (BANA's "interpretation of how broadly it may exercise" its contractual right to unilaterally change the contract "virtually eliminates the good faith and fair dealing requirement from the Bank's relationship with its credit account customers").

     c.   The Bank's Practices Violate Class Members' Third-Party Beneficiary Rights Under the EDD-Bank Contract.

The Bank's Account Freeze Practices also violate provisions of BANA's contract with EDD that were specifically intended to benefit BANA Account holders, including requirements that BANA "disburse to each claimant the entire amount the EDD authorizes," Kirtley Dec. Exhibit 2 at 44 (Req. #130), and "process all benefit payment amounts provided by the EDD without alteration or adjustment," *id.* at 47 (Req. #153). The Bank's practice of indefinitely freezing accounts of cardholders who report fraudulent transactions, thereby refusing to disburse any further benefit payments authorized by the EDD, violates these express contract terms.

BANA's contract with EDD also requires a high level of service to its cardholders, including specific contractual guarantees of 24/7 customer service to assist with fraud claims, wait times no longer than two minutes, and no dropped calls. *See supra* at 2 n.4. These contractual promises are reinforced through the Bank's affirmative representation to class members that, "For your convenience … dedicated customer service representatives are available 24 hours a day, 7 days a week" and "EDD Debit Card Customer Service representatives can help" with "[i]nvestigat[ing] transactions" and "[p]rocess[ing] lost/stolen/ damaged card reports." Amaral Dec. Exhibit 2 (Bank FAQ Website) at 6-7.

BANA has failed to comply with these contractual obligations. Cardholders who have

called BANA's customer service hotline are typically kept on hold for *hours*, then often disconnected.[12] Some who are able to reach a live CSR are informed that the agents who handle fraud claims are unavailable. Ex. 17 (Mathews Dec.) ¶4; Ex. 28 (Suchomel Dec.) ¶¶8-9; Ex. 33 (Yaccarino Dec.) ¶7; Ex. 34 (Yick Dec.) ¶7. Almost all are told the agent is unable to assist the cardholder because the account has been frozen. Ex. 3 (Alvarez Dec.) ¶¶7, 13; Ex. 4 (Amateau Dec.) ¶¶9-10; Ex. 6 (Cajas Dec.) ¶7; Ex. 7 (Carey Dec.) ¶10; Ex. 8 (Choi Dec.) ¶7; Ex. 9 (Crawford Dec.) ¶ 8; Ex. 10 (Desu Dec.) ¶¶7-8, 11-12; Ex. 12 (Good Dec.) ¶11; Ex. 13 Hirschmann Dec.) ¶¶7-13; Ex. 14 (Koole Dec.) ¶7; Ex. 15 (LaFaye Dec.) ¶¶8-10; Ex. 17 (Mathews Dec.) ¶¶9, 12; Ex. 18 (Moreno Dec.) ¶¶6-8; Ex. 19 (Moon Dec.) ¶10; Ex. 21 (Peters Dec.) ¶¶8-12; Ex. 22 (Polk Dec.) ¶7; Ex. 33 (Yaccarino Dec.) ¶¶9-10; Ex. 35 (Zamora Dec.) ¶7. Some cardholders are berated and belittled by customer service agents, told they are "'not special'" and must "wait like everyone else," and hung up on. Ex. 35 (Zamora Dec.) ¶8; Ex. 24 (Rivera Dec.) ¶13. Many have spent anywhere from 20 to over 100 hours on the phone trying to resolve their fraud claims or account freeze—time they could have spent seeking employment. *See* Ex. 8 (Choi Dec.) ¶¶8-10 (at least 20 hrs); Ex. 9 (Crawford Dec.) ¶ 9 (at least 20 hrs); Ex. 13 (Hirschmann Dec.) ¶15 (over 40 hrs); Ex. 14 (Koole Dec.) ¶12 (over 100 hrs); Ex. 15 (LaFaye Dec.) ¶9 (over 80 hrs); Ex. 16 (Ly Dec.) ¶9 (called over 30 times); Ex. 17 (Mathews Dec.) ¶¶6, 10 (over 100 hrs); Ex. 19 (Moon Dec.) ¶11 (50-60 hrs); Ex. 21 (Peters Dec.) ¶11 (over 60 hrs); Ex. 29 (Thomas Dec.) ¶10 (over 20 hrs); Ex. 30 (Vela Dec.) ¶12 (over 100 hrs); Ex. 31 (Veronneau Dec.) ¶¶17-18 (115 hrs; "The frustration of not being able to get any answers from Bank of America has just destroyed me. I have zero recourse."). The Bank's abysmal treatment of its most vulnerable and financially at-risk customers during this pandemic fails to meet the specified mandates of its contract with EDD and falls far beneath any reasonable or commercially acceptable level of customer service under any circumstance.

As intended third-party beneficiaries, plaintiffs and class members have standing to

---

[12] *See, e.g.,* Ex. 1 (Aceves Dec.) ¶4; Ex. 4 (Amateau Dec.) ¶10; Ex. 9 (Crawford Dec.) ¶¶ 9-11; Ex. 10 (Desu Dec.) ¶10; Ex. 11 (Fazio Dec.) ¶¶9,19; Ex. 20 (Oosthuizen Dec.) ¶4; Ex. 22 (Polk Dec.) ¶8; Ex. 23 (Rahimi Dec.) ¶¶8, 16; Ex. 28 (Suchomel Dec.) ¶¶8-9; Ex. 32 (Willrich Dec.) ¶6; Ex. 34 (Yick Dec.) ¶¶7-8.

enforce the disbursement and customer service provisions of the Bank's contract with EDD. Viewing the contract terms and relevant circumstances, it is clear that class members "would in fact benefit from" performance of the contract, that "a motivating purpose of the contracting parties was to provide a benefit" to those individuals, and that permitting them to bring a claim for breach of contract seeking specific performance "is consistent with the objectives of the contract and the reasonable expectations of the contracting parties." *Goonewardene v. ADP, LLC*, 6 Cal.5th 817, 830 (2019); *see also Zigas v. Superior Court*, 120 Cal.App.3d 827, 834-41 (1981) (tenants had third-party beneficiary standing to enforce rent provision of agreement between their landlords and federal government); *SEIU v. Options*, 200 Cal.App.4th 869, 879-80 (2011) (members of public had third-party beneficiary standing to enforce provisions requiring government contractor to comply with Brown Act).

### 3.  The Bank's Practices Violate the UCL.

The UCL prohibits "unfair competition," "broadly defined as including 'any unlawful, unfair or fraudulent business act or practice ....'" *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007) (quoting Cal. Bus & Prof. Code §17200). "California's UCL has a broad scope that allows for 'violations of other laws to be treated as unfair competition that is independently actionable' while also 'sweep[ing] within its scope acts and practices not specifically proscribed by any other law.'" *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1122 (9th Cir. 2009) (quoting *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 949 (2002)).

The same reasons why BANA's Fraud Response and Account Freeze Practices violate plaintiffs' rights under the Due Process Clause and EFTA/Regulation E also cause that conduct to be unlawful and independently enjoinable under the UCL. *Cel-Tech Commc'n., Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999); *Candelore v. Tinder, Inc.*, 19 Cal.App.5th 1138, 1155 (2018); Cal. Bus. & Prof. Code §17203. The Bank's practices are also "unfair." The UCL's "unfairness" test is "intentionally broad" and requires courts to "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Candelore*, 19

Cal.App.5th at 1155-56 (internal quotations omitted).[13] BANA's misconduct caused substantial injuries to customers who were unable to obtain recourse for the fraud committed on their accounts, who were denied access to their UI benefits, and whose losses ranged from hundreds to tens of thousands of dollars.[14] There was no saving-grace "utility" to the Bank's misconduct, which may have conserved the bank's own resources but provided no benefit to society.

BANA's practices are *particularly* unfair given its assurances to EDD Debit Card holders that the cards are a "[f]aster, easier and more secure" way to receive benefit payments," Amaral Dec. Exhibit 3, that Cardholders would incur "Zero Liability" for unauthorized transaction, *id.* Exhibit 1 at 6-7, and that BANA would provide "dedicated customer service representatives" "available 24 hours a day, 7 days a week" to help "investigate transactions" and "process lost/stolen/damaged card reports," *id.* Exhibit 2 at 6-7. BANA's unjustified denial of access to benefits funds and its failure to provide reasonable levels of customer service, forcing class members to waste hundreds of hours on futile calls with the Bank, violates the fundamental public policies underlying the UI statutes. *See Java*, 402 U.S. at 131-132 (purpose of UI is to "maintain the recipient at subsistence levels" and to provide security to workers so they can focus their time doing "[nothing] else but looking for a job"); *AFL*, 88 Cal.App.3d at 818.

## B.  The Balance of Equities Tips Sharply in Favor of Plaintiffs and Class Members

BANA itself recognizes that "[u]nemployment and disability payments are critical, often

---

[13] Courts have applied two separate "unfairness" tests: the "balancing test" considers the "impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer," *Smith v. State Farm Mutual Auto. Ins. Co*., 93 Cal.App.4th 700, 718 (2001), and the "tethering test," which requires the "public policy which is a predicate" for the claim of unfairness to "be 'tethered' to specific constitutional, statutory or regulatory provisions," *Gregory v. Albertson's, Inc.*, 104 Cal.App.4th 845, 854 (2002). BANA's misconduct is "unfair" under both tests because it has little utility and substantial adverse impact and because it violates the public policies underlying EFTA, due process, and other statutory and common law provisions at issue.
[14] *E.g.,* Ex. 12 (Good Dec.) ¶¶9, 14; Ex. 13 (Hirschmann Dec.) ¶¶6, 15-16; Ex. 14 (Koole Dec.) ¶¶12-13; Ex. 15 (LaFaye Dec.) ¶¶6, 11; Ex. 16 (Ly Dec.) ¶¶9-10; Ex. 17 (Mathews Dec.) ¶¶14-15; Ex. 18 (Moreno Dec.) ¶¶15-16; Ex. 19 (Moon Dec.) ¶¶6, 11-12; Ex. 21 (Peters Dec.) ¶¶6, 12-13; Ex. 22 (Polk Dec.) ¶¶6, 9-10; Ex. 23 (Rahimi Dec.) ¶19; Ex. 24 (Rivera Dec.) ¶¶11, 14; Ex. 25 (Rodriguez Dec.) ¶¶5, 8; Ex. 26 (Schmitt Dec.) ¶¶6, 10; Ex. 27 (Smith Dec.) ¶¶6, 8; Ex. 28 (Suchomel Dec.) ¶¶6, 13; Ex. 29 (Thomas Dec.) ¶¶5, 11; Ex. 30 (Vela Dec.) ¶¶7, 11; Ex. 31 (Veronneau Dec.) ¶¶17-18 Ex. 33 (Yaccarino Dec.) ¶¶6, 10; Ex. 34 (Yick Dec.) ¶¶6, 14; Ex. 35 (Zamora Dec.) ¶10.

times providing claimants the ability to secure housing or purchase necessary medical prescriptions." Kirtley Dec. Exhibit 2 at 60 (Req. #241). BANA's practices have deprived class members of this critical lifeline for weathering a once-in-a-century pandemic, irreparably harming thousands of class members by depriving them of critically needed UI and PUA benefits when those funds are most needed, in some cases driving them to homelessness and depression.

As a result of BANA's actions, class members have been unable to pay rent and have either lost their homes or face the risk of eviction.[15] Some have fallen behind on car payments and already lost or risk losing their car, leaving them without transportation and so unable to go to work or look for work.[16] Some have been unable to pay their phone bill or other utilities and may soon lose these essential services.[17] Some have been unable to afford basic life necessities like groceries and toiletries, and have gone without food or "rationed" food for their children.[18] Some have been forced to forego necessary dental procedures.[19] Some have been left unable to cover the costs of childcare or school tuition.[20] Some have been forced into debt and seen their credit score plummet.[21] Almost all have lost dozens of hours or more on the phone with BANA trying to resolve their fraud claims and frozen accounts, and almost all have suffered anxiety and emotional distress from the uncertainty and financial hardship caused by BANA's actions.[22] Absent immediate injunctive relief, these irreparable harms will continue to compound.

BANA, by contrast, will not be harmed by being ordered to comply with its statutory and contractual obligations. *Withrow v. Concannon*, 942 F.2d 1385, 1387-88 (9th Cir. 1991) (An injunction requiring adherence to the regulations … imposes no inappropriate obligations ….");  *Haskins v. Stanton*, 794 F.2d 1273, 1277 (7th Cir. 1986) (same). In any event, any burdens to

---

[15] *E.g.*, Ex. 5 (Bulvas Dec.) ¶10; Ex. 16 (Ly Dec.) ¶10; Ex. 19 (Moon Dec.) ¶12; Ex. 24 (Rivera Dec.) ¶14; Ex. 26 (Schmitt Dec.) ¶10; Ex. 31 (Veronneau Dec.) ¶18.
[16] *E.g.*, Ex. 5 (Bulvas Dec.) ¶10; Ex. 22 (Polk Dec.) ¶9.
[17] *E.g.*, Ex. 5 (Bulvas Dec.) ¶10; Ex. 15 (LaFaye Dec.) ¶11; Ex. 16 (Ly Dec.) ¶10; Ex. 22 (Polk Dec.) ¶9; Ex. 24 (Rivera Dec.) ¶14; Ex. 35 (Zamora Dec.) ¶11.
[18] *E.g.*, Ex. 7 (Carey Dec.) ¶12; Ex. 14 (Koole Dec.) ¶13; Ex. 16 (Ly Dec.) ¶10; Ex. 24 (Rivera Dec.) ¶14; Ex. 30 (Vela Dec.) ¶12.
[19] *E.g.*, Ex. 7 (Carey Dec.) ¶12.
[20] *E.g.*, Ex. 29 (Thomas Dec.) ¶11.
[21] *E.g.*, Ex. 19 (Moon Dec.) ¶12; Ex. 21 (Peters Dec.) ¶13; Ex. 35 (Zamora Dec.) ¶11.
[22] *E.g.*, Ex. 14 (Koole Dec.) ¶10; Ex. 15 (LaFaye Dec.) ¶11; Ex. 21 (Peters Dec.) ¶13; Ex. 24 (Rivera Dec.) ¶14; Ex. 30 (Vela Dec.) ¶12; Ex. 31 (Veronneau Dec.) ¶18.

BANA pale in comparison to the irreparable harm plaintiffs and class members will continue to suffer without immediate injunctive relief. *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) ("Faced with … a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor."); *see also Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*, 512 F.3d 1112, 1126 (9th Cir. 2008). The balance of equities tips sharply in favor of an injunction.

### C.  An Immediate Injunction is in the Public Interest.

The public interest also strongly favors an injunction, given BANA's violation of plaintiffs' and class members' rights under the U.S. and California Constitutions, EFTA and Regulation E, BANA's contracts with EDD Cardholders and EDD, and the UCL. The public has a strong interest in ensuring that state actors comply with the Constitution. *See Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017). "'[E]ven in a pandemic, the Constitution cannot be put away and forgotten.'" *Harvest Rock Church, Inc. v. Newsom*, 985 F.3d 771, 774 (9th Cir. 2021) (quoting *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 68 (2020)).

The public also has a strong interest in ensuring individuals who have lost employment, mostly during and as a result of the COVID-19 pandemic, receive the emergency economic relief the government specifically provided and that they so desperately need. *Cf. Washington v. DeVos*, 466 F.Supp.3d 1151, 1171 (E.D. Wash. 2020) ("Congress passed the CARES Act to provide *emergency* economic relief …."). In *Washington*, for example, the court held that the public interest favored preliminarily enjoining the Department of Education from implementing eligibility restrictions for emergency financial aid grants under the CARES Act: "[T]he harm [to students] is in the inability to access these emergency funds in a timely manner. Absent injunctive relief, students will continue to be denied access to emergency relief funds to which they are likely otherwise entitled." *Id.*; *see also Oakley v. DeVos*, No. 20-cv-03215-YGR, 2020 WL 3268661, at *18 (N.D. Cal. June 17, 2020) (same); *Camelot Banquet Rooms, Inc. v. U.S. Small Business Admin.*, 458 F.Supp.3d 1044, 1064 (E.D. Wis. 2020) ("Guaranteeing the plaintiffs' [PPP] loans now, rather than months from now when this case is over, furthers the

public interest in helping all small businesses and their employees get through the pandemic.").

The public interest heavily favors enjoining BANA from engaging in conduct that deprives countless legitimate claimants of the UI and PUA benefits to which they are entitled. "The purpose of unemployment insurance is to provide the worker with security while unemployed through no fault of his own, and to enable the worker to find employment without resorting to other types of relief such as welfare. … [T]hese ends can only be accomplished through prompt payment of benefits." *AFL*, 88 Cal.App.3d at 818. As the Ninth Circuit has admonished, "[o]ur society as a whole suffers when we neglect the poor, the hungry, the disabled, or when we deprive them of their rights or privileges." *Lopez*, 713 F.2d at 1437. "Society's interest lies on the side of affording fair procedures to all persons …. It would be tragic, not only from the standpoint of the individuals involved but also from the standpoint of society, were poor, elderly, disabled people to be wrongfully deprived of essential benefits for any period of time." *Id.* Here, as in *Lopez*, "the balance of hardships as between the litigants lies sharply in favor of the plaintiffs. When the public interest is included, that balance is overwhelming." *Id.* at 1438.

### D.  No Bond Should Be Imposed.

Rule 65(c) vests courts "with discretion as to the amount of security required, if any." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Dispensing with a bond is appropriate when "requiring security would effectively deny access to judicial review," particularly when the likelihood of success on the merits favors little or no bond. *California ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325, *as modified by* 775 F.2d 998 (9th Cir. 1985). Here, individual plaintiffs are unemployed and cannot afford to post security and plaintiffs are likely to prevail on the merits and granting injunctive relief is in the public interest. For these reasons, the Court should exercise its discretion to dispense with requiring a bond.

### V.   THE COURT SHOULD PROVISIONALLY CERTIFY THE CLASS

The Ninth Circuit "ha[s] approved provisional class certification for purposes of preliminary injunction proceedings." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 n.4 (9th Cir.

2020) (citing *Meyer v. Portfolio Recovery Assoc., LLC*, 707 F.3d 1036, 1041-43 (9th Cir. 2012));

*see also Roman v. Wolf*, 977 F.3d 935, 944-45 (9th Cir. 2020) (affirming provisional certification

for preliminary injunction); *Zepeda Rivas v. Jennings*, 445 F.Supp.3d 36, 38-39 (N.D. Cal.

2020). Here, the Court should provisionally certify a Rule 23(b)(2) class comprising "All persons

who were issued or who used a Bank of America debit card for the purpose of accessing EDD

benefits deposited into a Bank of America account, at any time from January 1, 2020 through the

present." Plaintiffs Jennifer Yick, Roland Oosthuizen, Rosemary Mathews, Clara Cajas, Alan

Karam, Candace Koole, Azuri Moon, Luis Perez, Vanessa Rivera, Carlos Rodriguez, Stephanie

Smith, and Michael Willrich should be provisionally certified as class representatives, and

plaintiffs' counsel Cotchett, Pitre & McCarthy, LLP and Altshuler Berzon LLP provisionally

certified as class counsel. All requirements of Rule 23(a) are satisfied, and preliminary injunctive

relief benefitting the class would be appropriate. Fed. R. Civ. P. 23(a), 23(b)(2).

### A.  The Requirements of Rule 23(a) Are Satisfied.

The proposed class is sufficiently numerous that joinder is impracticable under Rule

23(a)(1), as BANA has issued debit cards to millions of individuals EDD found eligible for UI or

PUA benefits since the pandemic began. *See* Amaral Dec. Exhibit 9 at 1; *In re High-Tech

Employee Antitrust Litig.*, 985 F.Supp.2d 1167, 1180 (N.D. Cal. 2013); *Saravia v. Sessions*, 280

F.Supp.3d 1168, 1202-03 (N.D. Cal. 2017) ("Where a plaintiff 'seeks only injunctive and

declaratory relief, the numerosity requirement is relaxed . . .'") (citation omitted).

Commonality under Rule 23(a)(2) is also satisfied. "A common question is one where the

same evidence will suffice for each member to make a prima facie showing or the issue is

susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036,

1045 (2016). "All questions of fact and law need not be common …. The existence of shared

legal issues with divergent factual predicates is sufficient, as is a common core of salient facts

coupled with disparate legal remedies within the class." *Meyer v. Portfolio Recovery Assoc.,

LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012) (internal quotations omitted). "[A]ll that Rule 23(a)(2)

requires is a single significant question of law or fact." *Abdullah v. U.S. Sec. Assocs., Inc*., 731

F.3d 952, 957 (9th Cir. 2013). Whether a class-wide common policy exists may itself be a common question. *See Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014). The preceding analysis identified many common issues concerning BANA's administration of EDD's public benefits program, including the fact, scope, and legality of BANA's challenged practices—any one of which would suffice as a "common" issue.

Rule 23(a)(3) typicality requires the class representatives' claims to arise from the same course of events and to rely on similar legal arguments as other class members'. "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (internal quotations omitted). "[T]ypicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Id.* (internal quotations omitted). Here, plaintiffs' injuries and claims are typical. All plaintiffs and class members received EDD Debit Cards after being found eligible for public benefits by EDD, and all were injured and/or face the threat of future injury resulting from BANA's challenged practices. *See, e.g.,* Ex. 6 (Cajas Dec.); Ex. 14 (Koole Dec.); Ex. 17 (Mathews Dec.); Ex. 19 (Moon Dec.); Ex. 20 (Oosthuizen Dec.); Ex. 24 (Rivera Dec.); Ex. 25 (Rodriguez Dec.); Ex. 27 (Smith Dec.); Ex. 32 (Willrich Dec.); Ex. 34 (Yick Dec.); Ex. 36 (Perez Dec.). These plaintiffs' claims are "reasonably co-extensive with those of absent class members," and they each experienced "the same or similar injury." *Parsons*, 754 F.3d at 685.

Rule 23(a)(4)'s adequacy requirement is also satisfied. Plaintiffs and their counsel lack any conflicts of interest with other class members and will vigorously prosecute the action. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011). Plaintiffs are aware of their role as class representatives, willing to serve, and have no conflicts. Ex. 6 (Cajas Dec.) ¶¶10-12; Ex. 14 (Koole Dec.) ¶¶ 14-16; Ex. 17 (Mathews Dec.) ¶¶16-18; Ex. 19 (Moon Dec.) ¶¶13-15; Ex. 20 (Oosthuizen Dec.) ¶¶10-12; Ex. 24 (Rivera Dec.) ¶¶15-17; Ex. 25 (Rodriguez Dec.) ¶¶10-12; Ex. 27 (Smith Dec.) ¶¶9-11; Ex. 32 (Willrich Dec.) ¶¶13-15; Ex. 34 (Yick Dec.) ¶¶15-17; Ex. 36 (Perez Dec.) ¶¶15-17; Ex. 39 (Karam Dec.) ¶¶17-19.

**B.  BANA Acted and Refused to Act on Grounds that Apply Generally to the Class.**

Plaintiffs have also shown that BANA "has acted or refused to act on grounds that apply generally to the class," making preliminary injunctive relief appropriate under Rule 23(b)(2). "That inquiry does not require an examination of the viability or bases of the class members' claims for relief." *Parsons*, 754 F.3d at 688 (citing *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010)). The relevant question is "whether class members seek uniform relief from a practice applicable to all of them." *Rodriguez*, 591 F.3d at 1125. "The fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from meeting the requirements of Rule 23(b)(2)." *Id*.

**C.  The Court Should Appoint Co-Lead Counsel as Provisional Class Counsel**

Cotchett, Pitre & McCarthy, LLP ("CPM") and Altshuler Berzon LLP ("ABL") respectfully request to be provisionally appointed class counsel under Rule 23(g)(1). CPM and ABL have already been appointed interim co-lead counsel (Dkt. No. 60), have performed substantial work identifying and investigating potential claims, have substantial class action and complex litigation experience including with claims similar to those at issue here, are familiar with the relevant law, and have adequate resources to litigate this case. *See* Joint Declaration of Brian Danitz and Michael Rubin.

<u>**CONCLUSION**</u>

For the foregoing reasons, plaintiffs request the Court provisionally certify the proposed class under Rule 23(b)(2) and enter a preliminary injunction as set forth in detail in the motion and accompanying proposed order, enjoining the Bank from continuing to violate Class Members' constitutional, statutory, contractual, and common law rights, including by requiring the Bank to: maintain customer service levels that ensure cardholders can report fraud and obtain assistance; reopen fraud claims of claimants who request such reopening through a streamlined process; unfreeze the accounts and reopen the fraud claims of claimants whose accounts were frozen based on their reports of fraud; conduct reasonable, good faith, and timely investigations into all fraud reports; and grant provisional and final credits where required by law.

Respectfully submitted,

Dated:  April 1, 2021                    **COTCHETT, PITRE & McCARTHY, LLP**

By:  ___ */s/ Brian Danitz* _____
      BRIAN DANITZ

Dated:  April 1, 2021                    **ALTSHULER BERZON LLP**

By:  ___ */s/ Michael Rubin* _____
      MICHAEL RUBIN

*Interim Co-Lead Counsel for Plaintiffs*
*and the Proposed Class*

**SIGNATURE ATTESTATION**

Pursuant to Local Rule 5-1(i)(3), I, Brian Danitz, attest that the other signatories listed, and on whose behalf this filing is submitted, concur in the filing content and have authorized this filing.

                    /s/ *Brian Danitz*
                    BRIAN DANITZ