JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
ANNE MARIE MURPHY (SBN 202540)
amurphy@cpmlegal.com
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
KARIN B. SWOPE (Pro Hac Vice)
kswope@cpmlegal.com
ANDREW F. KIRTLEY (SBN 328023)
akirtley@cpmlegal.com
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Interim Co-Lead Counsel for Plaintiffs and the
Proposed Class*

MICHAEL RUBIN (SBN 080618)
mrubin@altber.com
STACEY M. LEYTON (SBN 203827)
sleyton@altber.com
MATTHEW MURRAY (SBN 271461)
mmurray@altber.com
CONNIE K. CHAN (SBN 284230)
cchan@altber.com
JAMES BALTZER (SBN 332232)
jbaltzer@altber.com
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

*Interim Co-Lead Counsel for Plaintiffs and
the Proposed Class*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JENNIFER YICK,** **ROLAND OOSTHUIZEN,** **ROSEMARY MATHEWS,** **CARLOS RODRIGUEZ,** **J. MICHAEL WILLRICH,** **LINDSAY MCCLURE,** **ROBERT L. WILSON,** **CHRISTOPHER MOSSON,** **CLARA CAJAS,** **STEPHANIE SMITH,** **ALAN KARAM,** **AZURI MOON,** **VANESSA RIVERA,** **CANDACE KOOLE, and** **LUIS PEREZ,** on behalf of themselves and all others similarly situated, | **Case No. 3:21-cv-00376-VC** CLASS ACTION **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION** Date:  May 13, 2021 Time: 2:00 p.m. Crtm: 4, 17th Floor Judge: Hon. Vince Chhabria |
| Plaintiffs, | |
| vs. | |
| **BANK OF AMERICA, N.A.**; and DOES 1 through 50, inclusive, | |
| Defendants. | |

## TABLE OF CONTENTS

I.   THE COURT SHOULD PROVISIONALLY CERTIFY THE CLASS ......................... 1

 A.  Article III Standing Requirements Are Satisfied. ............................................... 1

 B.  All Requirements of Rule 23(a) and Rule 23(b)(2) Are Satisfied...................... 2

II.  PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION ..................... 3

 A.  Plaintiffs Are Likely to Succeed on the Merits of Their Claims Underlying the Requested "Claims Investigation" Injunctions. ..................................................................... 3

  1.  The Bank's "Claims Investigation" Practices Violate EFTA, Its Cardholder Agreements, and Its EDD-Bank Contract. ......................................................... 3

 B.  Plaintiffs Are Likely to Succeed on the Merits of Their Claims Underlying the Requested "Account Freeze" Injunctions............................................................. 5

  1.  The Bank's Account Freeze Practices Breach its Contracts and Their Implied Covenants of Good Faith and are Unfair under the UCL.................................. 6

  2.  The Bank's Account Freeze Practices Violate Due Process. ........................... 7

   a.  The Bank Is A State Actor................................................................... 7

   b.  The Bank's Procedures Fail the *Mathews v. Eldridge* Balancing Test. ...................... 9

 C.  Plaintiffs Are Likely to Succeed on the Merits of Their Claims Underlying the Requested "Customer Service" Injunctions.......................................................... 10

  1.  The Bank's Customer Service Practices Are Unfair Under the UCL and Breach the EDD-Bank Contract. ...................................................................... 10

  2.  Plaintiffs Are Third Party Beneficiaries of the EDD-Bank Contract. ............................ 11

 D.  Plaintiffs Face a Likelihood of Irreparable Harm, and the Balance of Equities and Public Interest Tips Sharply in Their Favor. .................................................... 12

III. THE REQUESTED RELIEF IS NECESSARY AND APPROPRIATE........................ 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFL-CIO v. EDD*,
  88 Cal.App.3d 811 (1979) ...............................................................................9, 13

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
  526 U.S. 40 (1999)....................................................................................................8

*Badie v. Bank of Am.*,
  67 Cal.App.4th 779 (1998) ......................................................................................7

*Bates v. United Parcel Serv., Inc.*,
  511 F.3d 974 (9th Cir. 2007) ..................................................................................1

*Beno v. Shalala*,
  30 F.3d 1057 (9th Cir. 1994) ................................................................................12

*Bowen v. Mass.*,
  487 U.S. 879 (1988)................................................................................................15

*Briggs v. Sullivan*,
  886 F.2d 1132 (9th Cir. 1989) ..............................................................................12

*Brown v. Stored Value Cards, Inc.*,
  2016 WL 4491836 (D. Or. Aug. 25, 2016)...........................................................8

*Burton v. Wilmington Parking Auth.*,
  365 U.S. 715 (1961)..................................................................................................8

*Byorth v. USAA Casualty Ins. Co.*,
  333 F.R.D. 519 (D. Mont. 2019)............................................................................3

*Campion v. Old Rep. Home Prot. Co.*,
  272 F.R.D. 517 (S.D. Cal. 2011) ...........................................................................2

*D.L. v. Dist. of Columbia*,
  713 F.3d 120 (D.C. Cir. 2013) ...............................................................................2

*De La Torre v. CashCall, Inc.*,
  5 Cal.5th 966 (2018) ...............................................................................................7

*Dioquino v. Sempris, LLC*,
  2012 WL 6742528 (C.D. Cal. Apr. 9, 2012) .......................................................2

*FDIC v. Mallen*,
    486 U.S. 230 (1988) .................................................................................9

*Fuentes v. Shevin*,
    407 U.S. 67 (1972) .............................................................................9, 10

*Gale v. Hyde Park Bank*,
    384 F.3d 451 (7th Cir. 2004) ...................................................................5

*GECCMC 2005-C1 Plummer St. Office Ltd P'ship v. JPMorgan Chase Bank*,
    671 F.3d 1027 (9th Cir. 2012) ...............................................................12

*Geneva Tower Tenants Org. v. Federated Mortg. Invs.*,
    504 F.2d 483 (9th Cir. 1974) ...................................................................8

*Goldberg v. Kelly*,
    397 U.S. 254 (1970) ...........................................................................9, 10

*Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*,
    512 F.3d 1112 (9th Cir. 2008) ...............................................................13

*Goonewardene v. ADP*,
    6 Cal.5th 817 (2019) ..............................................................................12

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) .................................................................15

*Herskowitz v. Apple, Inc.*,
    301 F.R.D. 460 (N.D. Cal. 2014) ............................................................2

*Hewlett v. Squaw Valley Ski Corp.*,
    54 Cal.App.4th 499 (1997) ....................................................................14

*Jamie S. v. Milwaukee Pub. Sch.*
    668 F.3d 481 (7th Cir. 2012) ...................................................................2

*Jimenez v. Allstate Ins. Co.*,
    765 F.3d 1161 (9th Cir. 2014) .................................................................3

*Kilgore v. KeyBank, N.A.*,
    718 F.3d 1052 (9th Cir. 2013) ...............................................................14

*Leschniok v. Heckler*,
    713 F.2d 520 (9th Cir. 1983) .................................................................12

*Lopez v. Heckler*,
    713 F.2d 1432 (9th Cir. 1983) ...............................................................12

*Mathews v. Chevron Corp.*,
    362 F.3d 1172 (9th Cir. 2004) ..........................................................................15

*Moran v. Prime Healthcare Mgmt., Inc.*,
    3 Cal.App.5th 1131 (2016) ...................................................................................7

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
    810 F.3d 631 (9th Cir. 2015) ..............................................................................14

*Pasadena Republican Club v. W. Justice Ctr.*,
    985 F.3d 1161 (9th Cir. 2021) ..............................................................................8

*Rawson v. Recovery Innovations, Inc.*,
    975 F.3d 742 (9th Cir. 2020) ................................................................................8

*Rendell-Baker v. Kohn*,
    457 U.S. 830 (1982).................................................................................................8

*Rodriguez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010) ..............................................................................3

*Ross v. Lockheed Martin Corp.*,
    2020 WL 4192566 (D.D.C. July 21, 2020)...........................................................2

*Sampson v. Murray*,
    415 U.S. 61 (1974)................................................................................................12

*Shell v. Schmidt*,
    126 Cal.App.2d 279 (1954) .........................................................................11, 12

*South Bay Chevrolet v. Gen. Motors Acceptance Corp.*,
    72 Cal.App.4th 861 (1999) ....................................................................................7

*Spiegel v. Ryan*,
    946 F.2d 1435 (9th Cir. 1991) .........................................................................9, 10

*Tinsley v. Snyder*,
    922 F.3d 957 (9th Cir. 2019) .................................................................................1

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)................................................................................................2

*Wilson v. Harris, N.A.*,
    2007 WL 2608521 (N.D. Ill. Sept. 4, 2007) ........................................................3

*Withrow v. Concannon*,
    942 F.2d 1385 (9th Cir. 1991) ............................................................................15

*Zigas v. Superior Court*,
   120 Cal.App.3d 827 (1981) ...............................................................................11, 12

**Statutes**

15 U.S.C. §1693f .............................................................................................................3, 4

12 C.F.R. §1005.2(b)(3) ......................................................................................................2

12 C.F.R. §1005.11(c)........................................................................................................3, 4

12 C.F.R. §1005.15(a)(2)......................................................................................................2

31 C.F.R. §1020.320(a)........................................................................................................5

**Rules**

Federal Rules of Civil Procedure:

   Rule 23(a)..............................................................................................................2

   Rule 23(b)(2).....................................................................................................1, 2, 3

   Rule 23(b)(3).........................................................................................................2

The Bank's response to Plaintiffs' detailed factual submissions and well-supported legal analysis rests on platitudes and generalities. The Bank offers scant or no rebuttal to many of Plaintiffs' claims. Nor does it seriously dispute the key factual predicates supporting injunctive relief. The Bank admits the secret "fraud analysis" it purportedly used to deny the claims and freeze the accounts of tens of thousands of Class Members erroneously branded *at least 66,000* legitimate benefits recipients as "criminals." Yet the Bank *continues* to use this highly flawed "fraud analysis" on a classwide basis to summarily deny claims and freeze (or "block") accounts without further investigation, forcing Class Members to undergo an often futile months-long process to regain access to their benefits. The Bank also admits the only customer service representatives (CSRs) actually authorized to assist cardholders with fraud claims and frozen/blocked accounts are *not* available 24/7. The Bank's professed concern that the injunction will be a "bonanza for criminals" ignores that it only addresses *Bank*-initiated freezes and claim denials; nothing impairs EDD's or law enforcement's ongoing efforts to combat UI fraud.

As the supplemental declarations submitted with this reply demonstrate, the same Bank practices that have harmed Plaintiffs continue to harm new victims every day, depriving them of their only source of income and leaving them unable to pay their rent or feed their families. The Bank's conduct will continue to harm countless others unless immediately enjoined.[1]

## I.      THE COURT SHOULD PROVISIONALLY CERTIFY THE CLASS

### A.  Article III Standing Requirements Are Satisfied.

The Bank argues that Article III precludes provisional class certification because some Class Members may lack standing. Opp. 19-21. But in a Rule 23(b)(2) class action, "standing is satisfied if at least one named plaintiff meets the requirements." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc); *see also B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 966-67 (9th Cir. 2019) (if one plaintiff has standing, standing inquiry ends).[2]

---

[1] As used herein, "Ex." refers to exhibits to the Declaration (Dkt. No. 65; Exs. 1-39) and Supplemental Declaration (Dkt. No. 81; Exs. 40-52) of Brian Danitz in support of this Motion.
[2] The Bank does not dispute many named plaintiffs' standing. *E.g.*, Ex. 14 (Koole Dec.) ¶¶6-10, 12-13; Ex. 24 (Rivera Dec.) ¶¶6-14; Ex. 25 (Rodriguez Dec.) ¶¶5-8; Ex. 27 (Smith Dec.) ¶¶6-8; Ex. 32 (Willrich Dec.) ¶¶5-12; Ex. 34 (Yick Dec.) ¶¶6-13; Ex. 36 (Perez Dec.) ¶¶6-14.

## B.  All Requirements of Rule 23(a) and Rule 23(b)(2) Are Satisfied.

The Bank also challenges Rule 23 commonality and whether it acted "on grounds that apply generally to the class," Opp. 23-25, but acknowledges several uniform, classwide policies and practices.[3] The Bank claims to have subjected all EDD Debit Cardholders who report unauthorized transactions to an initial "fraud analysis" to determine if they are "criminals ... not entitled to benefits." Letson Dec. ¶21; *see also* Daniels Dec. ¶¶5-6. If that initial analysis identifies the claimant as a likely criminal, the Bank (1) automatically closes the fraud claim without further investigation, and (2) automatically freezes (or, as of March 18, 2021, sometimes "blocks") the claimant's account without notice or opportunity to be heard and refuses to investigate further unless EDD directs it to unfreeze the account. Letson Dec. ¶¶19, 21; Gargagliano Dec. ¶¶4-5. The Bank also concedes that if a Class Member calls the Bank seeking help, the CSR answering the call will be untrained and unauthorized to provide substantive assistance, and must place the caller on hold and transfer them to a "Fraud Call Center" or "Claims Initiation Call Center," neither of which operates 24/7. Golden Dec. ¶¶14-15, 17-19.

Plaintiffs challenge these common policies and practices as unlawful and unfair, including because they deny Class Members their EFTA right to a "good faith investigation" before denial of their claims and provisional credit in the interim, due process right to notice and opportunity to be heard before being deprived of their benefits, and contract right to meaningful customer service. Mot. 8-19. Plaintiffs' common contentions will "drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).[4] And requiring the Bank to

---

[3] The Bank's cases in which no common practice existed (*Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 481 (N.D. Cal. 2014); *D.L. v. Dist. of Columbia*, 713 F.3d 120, 127 (D.C. Cir. 2013); *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497-99 (7th Cir. 2012); *Ross v. Lockheed Martin Corp.*, 2020 WL 4192566, *5 (D.D.C. July 21, 2020)) are thus inapposite, as are those addressing Rule 23(b)(3)'s "predominance" requirement (*Campion v. Old Rep. Home Prot. Co.*, 272 F.R.D. 517, 531 (S.D. Cal. 2011)). Opp. 22-24.

[4] Unlike the EFTA cases on which the Bank relies (Opp. 23), the common questions here do not turn on any individual's "unique" "chain of events." *Dioquino v. Sempris, LLC*, 2012 WL 6742528, *7 (C.D. Cal. Apr. 9, 2012). The Bank fails to explain why the PUA program falls under 12 C.F.R. §1005.2(b)(3)(ii)(B) instead of §1005.2(b)(3)(i)(B) and §1005.15(a)(2) (government benefit programs), but the answer is irrelevant because the Cardholder Agreement makes the Bank's Zero Liability policy and Regulation E applicable to all "accounts that involve the use of [an EDD Debit] Card." Amaral Dec. Exh. 1 at 6-9; and the Bank cannot presume Class

2

comply with EFTA by making a good faith investigation into each claim will not result in a "different injunction" (Opp. 24) for each Class Member. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1122-25 (9th Cir. 2010) (certifying Rule 23(b)(2) class challenging practice of prolonged detention without bond hearings and seeking injunction requiring individual hearings with "burden placed on the government").[5] Rule 23's requirements are thus satisfied. *See id.* at 1125-26; *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014); Mot. 22-25.

## II.    PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION

### A.  Plaintiffs Are Likely to Succeed on the Merits of Their Claims Underlying the Requested "Claims Investigation" Injunctions.

#### 1.  The Bank's "Claims Investigation" Practices Violate EFTA, Its Cardholder Agreements, and Its EDD-Bank Contract.

The Bank admits that it automatically closes all fraud claims flagged by its initial "fraud analysis" without further investigation. It contends this procedure (about which it reveals no information) satisfies EFTA's requirement that it promptly "investigate the alleged error" and "determine whether an error occurred." 15 U.S.C. §1693f(a); 12 C.F.R. §1005.11(c)(1); *see* Opp. 8, 10. But the Bank cannot satisfy EFTA by conducting *pro forma* "investigations" into claims of unauthorized transactions that, by the Bank's admission, have erroneously branded tens of thousands of law-abiding Class Members as criminals until EDD or the Bank re-confirms their eligibility through identity verification procedures the Bank *could* have applied at the outset.

EFTA imposes not only a procedural duty to investigate, but *substantive* duties to "make a *good faith* investigation of the alleged error" and to deny claims only upon "a *reasonable* basis." 15 U.S.C. §1693f(e) (emphases added) (also prohibiting willful denial of claim "when such conclusion could not reasonably have been drawn from the evidence available to the [Bank] at the time of its investigation").[6] The Bank's exclusive reliance on its initial "fraud analysis" is

---

Members "made fraudulent claims" or "opened accounts for criminal purposes" without first conducting the good faith investigation EFTA requires. Opp. 23.

[5] *See also, e.g.*, *Byorth v. USAA Casualty Ins. Co.*, 333 F.R.D. 519, 533-34 (D. Mont. 2019) (certifying Rule 23(b)(2) class where plaintiffs challenged common practice of adjusting claims "without … individualized investigation").

[6] *See also* Reg. E, Official Interpretations §1005.11(a)-4 (Bank must follow Regulation E error resolution procedures, even for *closed* accounts); *id.* §1005.11(c)(4)-5 (types of information banks should review in investigating claims); *Wilson v. Harris, N.A.*, 2007 WL 2608521, at *2

wholly unreasonable given its knowledge that a high percentage of flagged individuals are exactly who they say they are. *See infra* at 5-6. The Bank could easily root out these false positives by asking the same identity verification questions it apparently now asks in its new "unblocking" process (which, under EFTA, would be evidence "available to the [Bank]") *before* denying their claims and freezing their accounts. *Cf.* Gargagliano Dec. ¶9. And the Bank has shown it can quickly verify the identities of or reimburse claimants who file a lawsuit, appear in news reports, or make clear they have contacted Plaintiffs' counsel.[7]

To avoid paying provisional credit, the Bank routinely denies Class Members' claims without investigation, forcing them to seek "reconsideration" and undertake a convoluted and seemingly unending process to challenge that result. Mot. 4-5; Ex. 40 (Barron Dec.) ¶¶10-17; Ex. 42 (Gonzales Dec.) ¶¶12-15; Ex. 44 (Hollman Dec.) ¶¶6-10, 15-18; Ex. 47 (Peters Dec.) ¶¶6-12; Ex. 48 (Salgado Dec.) ¶¶6-13; Ex. 51 (Smith Dec.) ¶¶6-9. Bank now asserts that its "reconsideration" process *is not subject* to EFTA and that it can take as long as it wants to "re"-investigate claims without paying provisional credit. Opp. 10. But the Bank's deliberate choice *not* to undertake the same verification procedures at the outset that it can apparently apply with ease on "reconsideration" (when sufficiently motivated by a litigation threat) reveals that its classwide practice is just a transparent and unlawful scheme to circumvent EFTA and Regulation E, which require good faith investigations and payment of provisional credit if not timely completed. Mot. 4, 9; *see* 15 U.S.C. §1693f(c); 12 C.F.R. §1005.11(c)(2).

Nor can the Bank invoke "law enforcement guidance" as supposed justification for its failure to provide cardholders the EFTA-required "results of [its] investigation" and an "explanation of [its] findings." *See* Mot. 9; Opp. 10 n.10. The Bank claims it cannot disclose *any*

---

(N.D. Ill. Sept. 4, 2007) (denying dismissal where bank failed to investigate past ATM use, review security footage, or determine consumer's location during unauthorized transactions); *In re USAA Fed. Sav. Bank*, CFPB No. 2019-CFPB-0001 (Jan. 3, 2019) (restitution required where bank did not consider relevant details in its records and reasonable review would have favored consumer); *cf.* Ex. 31 (Veronneau Dec.) ¶16 (CSR conceded Bank "had photographic evidence showing the criminals who stole from my account" but "would not reimburse me").

[7] *See, e.g.*, Ex. 17 (Mathews Dec.) ¶11; Ex. 20 (Oosthuizen Dec.) ¶9; Ex. 43 (Grenfell Dec.) ¶¶11-12; *see also* Ex. 51 (Smith Dec.) ¶¶10-12; Amaral Dec. Exh. 13 at 4.

information about its same- or next-day denials. But even the FinCEN Advisory on which it relies identifies several "red flag indicators of UI fraud." Chan Dec. Exh. 9 at 2-3. The Bank could have provided a similar level of detail to cardholders whose claims it rejected *if defensible reasons existed*. Its failure to provide *any* explanation violates EFTA and underscores that it had no good faith basis. *See* Mot. 9; *Gale v. Hyde Park Bank*, 384 F.3d 451, 453 (7th Cir. 2004).[8]

For the same reasons Plaintiffs are likely to succeed on the merits of their claims under EFTA and Regulation E, which along with the Bank's "Zero Liability" policy are incorporated into the Cardholder Agreement and EDD-Bank Contract, they are also likely to succeed on their breach of contract and UCL "unlawful" claims. *See* Mot. 10-11, 18.

2. The Bank's "Claims Investigation" Practices Breach the Implied Covenant of Good Faith and Fair Dealing and Are Unfair Under the UCL.

The Bank's practice of denying without investigation the claims of anyone flagged by its flawed initial "fraud analysis," and subjecting those who seek reconsideration to a months-long process of uncertainty, long phone wait times, and futile calls with inadequately trained CSRs who provide false and contradictory information—while depriving those claimants of provisional credit—is "unfair" under the UCL and violates the implied covenant of good faith and fair dealing. Mot. 10-11, 18-19. The Bank offers *no* response to Plaintiffs' showing.

B. Plaintiffs Are Likely to Succeed on the Merits of Their Claims Underlying the Requested "Account Freeze" Injunctions.

Based solely on the results of its so-called "fraud analysis," the Bank not only summarily closes cardholders' fraud claims but also automatically freezes (or sometimes "blocks") cardholders' accounts without notice or opportunity to be heard, and without further investigation unless and until EDD directs it to unfreeze the accounts, which can take months given EDD's backlog. *See* Letson Dec. ¶¶19, 21; Gargagliano Dec. ¶¶4-5; Mot. 13 n.9.

The Bank *knows* its "fraud analysis" is gravely flawed and that it routinely freezes accounts of Class Members not flagged by EDD, law enforcement, or the Bank's secret "fraud

---

[8] The Bank cites an obligation "to keep suspicious activity reports ('SARs') confidential" (Opp. 10 n.10), but an EFTA-required explanation to cardholders of the basis for rejecting their claims is not a SAR, *see* 31 C.F.R. §1020.320(a), and does not require disclosure of a SAR.

mitigation strategies." Letson Dec. ¶23; Ex. 52. The Bank admits having unfrozen 66,000 accounts after EDD reconfirmed the claimants' eligibility and 900 more based on its own verification (while leaving at least 35,000 others frozen, despite EDD having verified 6,700). Chestnut Dec. ¶9; Gargagliano Dec. ¶¶4-5, 8, 15.[9] These numbers suggest the Bank's "fraud analysis" will continue to wrongfully ensnare tens of thousands of unemployed Californians.

For more than six months, the Bank took *no steps* to investigate the identities of frozen accountholders, test the accuracy of its initial "fraud analysis," or afford legitimate accountholders *any recourse* to preserve or regain access to the funds in their accounts. Not until March 18, 2021—after Plaintiffs put the Bank on notice of this motion—did the Bank introduce its new "unblocking" process to allow some (but far from all) accountholders to regain access to their accounts, which requires (yet again) calling the Bank and answering a series of identity-verification questions. Gargagliano Dec. ¶¶9, 11-12. This "unblocking" process is itself flawed. *See infra* at 14. More importantly, the Bank offers *no* justification for not having asked those same questions *before* freezing Class Member accounts (or for shifting the burden to request reopening on Class Members, in violation of EFTA and other legal obligations). Nor does the Bank explain why it has not made this re-authentication process available to *every* Class Member whose account it froze after they filed fraud claims.

The Bank's conceded practice of freezing legitimate claimants' benefits accounts for months on end based on no investigation (or, at most, a summary, error-prone "fraud analysis") and without notice or any pre- or prompt post-freeze opportunity for cardholders to re-verify their identities breaches the Bank's contracts and implied covenant of good faith and fair dealing, is unfair under the UCL, and violates due process.

1.   The Bank's Account Freeze Practices Breach its Contracts and Their Implied Covenants of Good Faith and are Unfair under the UCL.

The Cardholder Agreement provides that "[i]f [the Bank] suspect[s] irregular,

---

[9] The Bank's numbers are suspect because, among other reasons, they are not tied to specific time periods. And the false positive rate is likely even higher, as many additional legitimate benefits recipients have been verified by EDD, yet the Bank inexplicably refuses to unfreeze their account. *See* Mot. 5-6, 13 & n.10 (citing declarations); Ex. 42 (Gonzales Dec.) ¶¶8-10; Ex. 43 (Grenfell Dec.) ¶¶8-12; Ex. 46 (Ospina Dec.) ¶¶10-17.

unauthorized, or unlawful activities may be involved," it "may 'freeze' (or place a hold on) the balance pending an investigation." Amaral Dec. Exh. 1 at 2. The Bank contends that this gives it unbounded discretion to freeze accounts based on its unreviewable "susp[icion]," no matter how baseless or lacking in good faith, without providing notice or an opportunity to be heard, and to maintain that freeze indefinitely, even if the Bank takes no steps to "investigat[e]" the underlying basis for the freeze, or to ask the cardholder relevant identity-verification questions. *See* Opp. 12.

The Bank's position violates the Cardholder Agreement's plain terms (which authorize a freeze only "pending an investigation" of the "suspected activities") and "virtually eliminates the good faith and fair dealing requirement." *Badie v. Bank of Am.*, 67 Cal.App.4th 779, 795-97 (1998) (bank must exercise its discretionary power reasonably and consistent with parties' legitimate expectations); Mot. 15-16. It also breaches its obligations under the EDD-Bank Contract to "disburse to claimants the amounts that EDD authorizes," Ex. 52 at 2; *see* Kirtley Dec. Exh. 2 at 44, 47; Mot. 16, and is "unfair" under the UCL. *See* Mot. 18-19.[10]

2.  The Bank's Account Freeze Practices Violate Due Process.

a.  The Bank Is A State Actor.

The Bank denies that it engages in "joint action" rendering it a state actor, characterizing itself as "merely contracting with the government." Opp. 13-14. But that ignores its revenue-sharing arrangement with EDD and belies the many ways its account-freeze practices are intertwined and jointly undertaken with EDD, including (as shown by the Bank's own evidence) that it notifies EDD of all account freezes to enable EDD to "review the cardholder's status and determine whether the cardholder is legitimately entitled to the benefits in the card account" and "continu[es] to work together" with EDD to decide which accounts should remain frozen.[11]

---

[10] While the UCL "does not give the courts a *general* license to review the fairness of contracts," it does impose liability where, as here, the challenged practice is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal.App.4th 861, 886-87 (1999) (emphasis added). Courts have permitted UCL claims to go forward even where a contract purported to authorize the challenged conduct. *See De La Torre v. CashCall, Inc.*, 5 Cal.5th 966, 981 (2018); *Moran v. Prime Healthcare Mgmt., Inc.*, 3 Cal.App.5th 1131, 1149 (2016). In any case, the Bank's conduct was not authorized by the Cardholder Agreement, so the Bank's cases at Opp. 13 n.13 are inapposite.

[11] Gargagliano Dec. ¶¶4-6, 8, 15; Chestnut Dec. ¶¶8-9; *see also* Letson Dec. ¶¶13-19, 25-26 ("BANA has devoted substantial resources and attention to assisting EDD" fraud efforts, such as

EDD's website confirms this intertwinement, pledging that EDD is "continuing to work with Bank of America on shutting down fraudulent claims" and offering guidance on how claimants with frozen accounts can determine whether to contact EDD or the Bank. Amaral Dec. Exh. 6. This case is readily distinguishable from *Pasadena Republican Club v. W. Justice Ctr.*, 985 F.3d 1161 (9th Cir. 2021) (cited at Opp. 13-14), where the government lessor obtained no revenue from the private actor's lease agreement and had "no input or control" over, or knowledge of, the meeting-room rentals at issue. *Id.* at 1165, 1169-71 (quoting lease).[12]

Independently, the Bank is a state actor here because it performs a public function. The Bank does not merely "issu[e] service[e] debit cards." Opp. 13. As it elsewhere acknowledges, the Bank was "retained by EDD" pursuant to an exclusive contract now in its eleventh year "*to distribute unemployment benefits* to qualified claimants." Chestnut Dec. ¶3 (emphasis added); *see also* Letson Dec. ¶10 (similar). The Bank does not dispute that this is a traditional public function, and as in *Brown v. Stored Value Cards, Inc.*, 2016 WL 4491836 (D. Or. Aug. 25, 2016), Class Members' relationship with the Bank "only c[a]me about through the exercise of the state's power" making the Bank its exclusive benefits distribution partner. *Id.* at *2.[13] As the EDD's exclusive benefits distribution partner, the Bank in practice performs the exclusive public

---

joint meetings, alerting EDD to fraud indicators, giving EDD specific lists, complying with EDD requests to freeze or consider freezing accounts, notifying EDD of Bank-initiated freezes).

[12] The public entity also had no involvement or influence in the defendant's decisions in *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), and allowed but did not influence the conduct in *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999). The Bank asserts *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961), is "inapposite" without explaining why and despite similar evidence of financial interdependence. *See* Mot. 14 (citing Kirtley Dec. Exh. 2 at 1, ¶¶98, 100-04). The Bank also ignores the on-point *Geneva Tower Tenants Org. v. Federated Mortg. Invs.*, 504 F.2d 483, 487-88 (9th Cir. 1974), in which private landlords received federal subsidies and agreed to abide by subsidy rules. Here, the mutual contractual benefits, the Bank's obligation to abide by EDD rules, and coordinated EDD-Bank efforts to address account freezes "together," Chestnut Dec. ¶9, strongly support Plaintiffs' joint action allegations. *See also Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 753-54 (9th Cir. 2020) (state's involvement in private parties' acts and decisions) (citing *Jensen v. Lane Cty.*, 222 F.3d 570, 575 (9th Cir. 2000)).

[13] The Bank also does not dispute that its debit cards are EDD's default payment mechanism or that EDD strongly encourages their use. Amaral Dec. Exhs. 4, 5. The Bank points only to an opt-out procedure for receiving paper checks referenced on page 6 of a dense, 19-page document, which there is no evidence any cardholder has seen, and which requires the cardholder to "contact the EDD" (thus enduring EDD's extended wait times). Chan Dec. ¶5 & Exh. 3 at 3; *compare* Amaral Dec. Exhs. 4, 5 (mentioning only debit card option).

functions of both distributing *and* determining when to withhold benefits by freezing accounts it has determined to be fraudulent. *See* Ex. 52.

        b.  <u>The Bank's Procedures Fail the *Mathews v. Eldridge* Balancing Test.</u>

The Bank entirely ignores *AFL-CIO v. EDD*, 88 Cal.App.3d 811 (1979), which held that unemployment benefits recipients are entitled to a *pre*-deprivation notice and hearing before losing their benefits. *See* Mot. 12. Instead, the Bank makes two meritless points.

First, the Bank erroneously states that due process is not implicated because "account freezes do not suspend future benefit payments." Opp. 14 n.14. But dozens of Class Members have testified that the Bank's account freeze immediately halted their benefits, requiring them to spend hours on the phone with EDD and typically depriving them of benefits for extended periods. *See* Mot. at 5; *cf. Fuentes v. Shevin*, 407 U.S. 67, 84-85 (1972) (due process applies to a "temporary, nonfinal deprivation of property"); *AFL*, 88 Cal.App.3d at 821 (retroactive lump sum payments cannot make UI beneficiaries whole). It is also undisputed that account freezes strip cardholders of access to benefits payments already *in* their account, and those funds seizures are no less subject to the requirements of due process than the suspension of continuing benefits. *See Fuentes*, 407 U.S. at 81-82.

Second, the Bank argues that its failure to provide pre-deprivation notice is justified by its "interest in fighting widespread fraud." Opp. 14. But the risk that moneys paid pending a hearing will be unrecoverable from claimants who prove to be illegitimate is outweighed by the interest in ensuring fair pre-deprivation hearings. *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 266 (1970) (pre-termination hearing required even though "benefits paid to ineligible recipients pending decision at the hearing probably cannot be recouped"). "The potential abuse by some of the procedures designed to protect all claimants cannot be the basis for deciding whether the procedures are required by due process." *AFL*, 88 Cal.App.3d at 821.[14]

---

[14] The Bank's cases are readily distinguishable. *FDIC v. Mallen*, 486 U.S. 230 (1988), upheld post-suspension procedures for an indicted bank official suspended from participating in bank affairs, because the grand jury's findings provided reasonable assurance that the suspension "was not baseless." *Id.* at 241. *Spiegel v. Ryan*, 946 F.2d 1435 (9th Cir. 1991), upheld a post-deprivation hearing procedure because the governing regulations required the agency to "meet

Even if due process did not require *pre*-termination notice and hearing, the Bank offers no justification for its egregious practices here: failing to provide notice until long after the fact (if at all); failing to provide any explanation of the basis for the freeze (thereby depriving the claimant of any ability "to be fully informed of the case against him so that he may contest its basis and produce evidence in rebuttal," *Goldberg*, 397 U.S. at 266); and failing to provide *any* prompt or reasonable opportunity to contest the basis for the Bank's "suspicion" that the cardholder is using a stolen identity. *See Fuentes*, 407 U.S. at 80 (notice and opportunity to be heard "'must be granted at a meaningful time and in a meaningful manner'") (citation omitted).

### C. Plaintiffs Are Likely to Succeed on the Merits of Their Claims Underlying the Requested "Customer Service" Injunctions.

#### 1. The Bank's Customer Service Practices Are Unfair Under the UCL and Breach the EDD-Bank Contract.

In opposing injunctive relief on grounds that its "[CSRs] are already available 24/7" and the "average wait time for reaching a live [CSR] is under two minutes" (Opp. 15-16), the Bank repeats the falsehoods it made to a State Assembly Subcommittee in January 2021. *See* Amaral Dec. Exh. 7 at 3 ("wait times at our call centers are 1 minute, with the tail being between 1 and 5 minutes"); *id.* (Chair Ting: "Oh that's absolutely not …. [The] very consistent [] feedback we are getting from a number of phone callers [is] that they are on hold for hours.").

The Bank's statements were misleading then *and* now. The Bank acknowledges that the front-line CSRs in its "Main Call Center" are not able to "handle[] claims … relating to unauthorized transactions" or blocked or frozen accounts—two issues that "arise frequently with EDD debit cards." Golden Dec. ¶¶14-15, 17-19. Those CSRs must place callers "on hold until a CSR in the Fraud or Claims Call Center is available." *Id.* ¶¶10, 14-15. The Bank is also conspicuously silent on the average wait times for transfers to the "Fraud" or "Claims Initiation" Call Centers (the relevant inquiry), neither of which is open 24/7. *Id.* ¶¶15, 17, 19.

The Bank is contractually required to address and resolve Class Member calls promptly, not just to pick up the phone only to place the caller on hold. The Bank promised in its RFP bid

specific statutory requirements before issuing the [relevant] order," and the "decision was supported by detailed findings … following a long investigation ...." *Id.* at 1440.

response, incorporated into the EDD-Bank Contract, that "dedicated [CSRs]" would be "available 24 hours a day, 7 days a week" to "[i]nvestigate transactions (fraud, security, use)," "[i]nitiate disputes," "[p]rocess lost/stolen/damaged card requests," and "answer claimants' questions and resolve problems." Kirtley Dec. Exh. 2 at 40, 48, 66, 69. The Bank made similar guarantees to cardholders in its FAQs. Amaral Dec. Exh. 2 at 6-7. And to secure its 2015 EDD contract renewal, the Bank represented that its "average handle time [for calls] [had been] 230 seconds." Kirtley Dec. Exh. 2 at 24 (emphasis added).[15]

Despite these promises, as demonstrated by nearly 50 Class Member declarations—virtually all describing experiences that post-date the Bank's supposed hiring of additional CSRs in Spring 2020—EDD cardholders have had to wait on hold for hours before being connected with *anyone*, are often disconnected,[16] and even when connected are often told that no help is available from the Bank. *See* Mot. 17 & n.12 (citing declarations). New declarations submitted with this Reply establish that these customer service problems are ongoing.[17] The Bank offers no justification for its broken promises to Class Members who sought assistance and does not even address Plaintiffs' UCL theory. *Compare* Mot. 19; Opp. 15-16.

2. Plaintiffs Are Third Party Beneficiaries of the EDD-Bank Contract.

The Bank argues Plaintiffs have no right to enforce the terms of the EDD-Bank Contract (Opp. 15) but it misstates the legal standard, which asks whether the relevant contract provisions benefit only EDD cardholders, reflecting the contracting parties' intent to confer third party enforcement rights. *See Zigas v. Superior Court*, 120 Cal.App.3d 827, 838-39 (1981) (tenants entitled to enforce rent limit provisions in government contracts providing financing assistance to landlords because tenants were only group that would benefit from those limits); *Shell v. Schmidt*, 126 Cal.App.2d 279, 290 (1954) (veterans who would reside in new homes entitled to

---

[15] "Average handle time or AHT is a metric used in contact centers to measure the average duration of one transaction. It usually starts from the customer beginning the interaction and covers hold time, talk time, and any other related tasks during the conversation." *See* TTEC Glossary, https://www.ttec.com/glossary/average-handle-time.

[16] The Bank's contrary declaration states only that its "system is not *designed* to disconnect a call if a CSR is unavailable." Golden Dec. ¶7 (emphasis added).

[17] *See, e.g.*, Ex. 41 (DiMattia Dec.) ¶¶10-19; Ex. 42 (Gonzales Dec.) ¶13; Ex. 44 (Hollman Dec.) ¶¶9-18; Ex. 45 (McDonnell Dec.) ¶¶11-14; Ex. 48 (Salgado Dec.) ¶¶11-13.

enforce construction specification provisions in homebuilders' federal contract).[18] Here, the customer service requirements of the EDD-Bank Contract benefit only EDD cardholders, not EDD. *See* Kirtley Dec. Exh. 2 at 6, 19, 48, 52, 54. Just as in *Shell*, where "the statute and the regulations … resulting in the contract were passed to aid and assist" veterans, 126 Cal.App.2d at 290, the purpose of the UI programs that EDD contracted with the Bank to help administer is to aid and assist unemployed Californians. *See also Zigas*, 120 Cal.App.3d at 839-40.[19]

### D.   Plaintiffs Face a Likelihood of Irreparable Harm, and the Balance of Equities and Public Interest Tips Sharply in Their Favor.

Plaintiffs have shown through nearly 50 declarations that the Bank's challenged practices have caused and are causing real hardship and suffering, including homelessness and food rationing. Mot. 6-7; *Beno v. Shalala*, 30 F.3d 1057, 1063 n.10 (9th Cir. 1994) (even relatively small reductions in family welfare benefits "impose irreparable harm on recipient families"); *Leschniok v. Heckler*, 713 F.2d 520, 523-24 (9th Cir. 1983) (inability to pay "costs of rent, utilities and food" due to denial of disability benefits is irreparable harm). "Back payments … cannot erase either the experience or the entire effect of several months without food, shelter or other necessities." *Briggs v. Sullivan*, 886 F.2d 1132, 1140 (9th Cir. 1989).[20]

The Bank also does not dispute the public's strong interest in "affording fair procedures to all persons" and in ensuring that those who have become unemployed during this pandemic receive *prompt* relief. *See Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983); Mot. 21-22. While the public also has an interest in preventing UI fraud, the Bank's challenged practices are neither necessary nor effective in achieving that goal. *See* Ex. 52 at 1-2; *supra* at 6. EDD has

---

[18] The contract in *GECCMC 2005-C1 Plummer St. Office Ltd P'ship v. JPMorgan Chase Bank*, 671 F.3d 1027, 1033 (9th Cir. 2012), had an express "no third-party beneficiary" clause.

[19] *Goonewardene v. ADP*, 6 Cal.5th 817 (2019) (Opp. 15 n.15) is distinguishable, as the purpose of the payroll-outsourcing contract was only "to provide a benefit to *the employer*," providing benefits to employees was *not* a motivating factor, contract terms were not designed to protect them, and the employees had "no need" to sue the payroll company because they could fully recover any unpaid wages from their employer. *Id.* at 836. Here, by contrast, Plaintiffs have no recourse against EDD for the Bank's contractual and statutory violations.

[20] *Sampson v. Murray*, 415 U.S. 61 (1974) is inapposite because it was limited to harms that routinely attend an individual's loss of employment. 415 U.S. 91-92 & n.68. The Bank's other cases are similarly inapposite, and none involve deprivation of public benefits. *See* Opp. 18 n.18.

already enhanced its own fraud-detection systems, including by contracting with a new identity verification vendor as of October 2020. Chan Dec. Exh. 1 at 3. None of the relief Plaintiffs seek will interfere with EDD's efforts to eliminate enrollment fraud, and none will require the Bank to pay individuals determined by EDD or law enforcement to be criminals. *See infra* at 15.[21] The public interest tips decidedly in Plaintiffs' favor. *See AFL*, 88 Cal.App.3d at 821.

The Bank contends that the requested injunction will harm it by requiring it to pay provisional credits to "card cracking" criminals. The Bank's claimed harm appears to be grossly exaggerated.[22] But even if taken at face value, when "preventable human suffering" is weighed against "entirely economic" injuries, "the balance of hardships tips sharply in favor of the parties seeking relief." *Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*, 512 F.3d 1112, 1126 (9th Cir. 2008); *see* Mot. 19-21. This is particularly so when comparing the suffering of indigent individuals who lost their livelihoods during the pandemic and rely on unemployment benefits as their sole source of income, against the capital resources of one of the nation's largest banks.

## III.    THE REQUESTED RELIEF IS NECESSARY AND APPROPRIATE

The Bank makes no serious undue-burden argument about the proposed injunction's "Claim Investigation" provisions (Proposed PI ¶¶11-12), "Customer Service" provisions (¶¶1-2), or the provision requiring reopening of fraud claims on request (¶3). Instead, it states this relief is unnecessary because it has been "working to protect vulnerable consumers" all along (Opp. 4) (a proposition the record evidence refutes). The Bank claims to have recently converted some "frozen" accounts to "blocked" status, which it claims adequately "protect[s] legitimate cardholders." Opp. 17. But this eleventh-hour response in no way provides Class Members the relief they need and to which they are entitled. As an initial matter, many accounts remain

---

[21] For example, Plaintiffs' requested injunction will not affect the 1.4 million accounts on which EDD stopped payment in late December or the 1.9 million claims that EDD disqualified based on its new Thomson Reuters security filters. *See* Chan Dec. Exh. 7 at 3.

[22] The $200 million the Bank "estimates" it lost to "card cracking" in 2020 is an aggregate amount across 12 state programs, and does not appear to exclude legitimate claims the Bank initially credited then wrongly denied. *See* Opp. 6; Letson Dec. ¶¶11-12. According to the Bank's own official, transactional fraud levels in the EDD program during the pandemic have been "very close to if not almost the same as the [level] of transactional fraud that we see in our normal card business." Amaral Dec. Exh. 7 at 6-7.

"frozen" rather than "blocked," even now. Ex. 49 (Haynes Dec.) ¶¶3, 5. Besides, the unblocking process is far from seamless. Class Members have spent hours on hold before reaching someone who can initiate this process. *See, e.g.*, Ex. 40 (Barron Dec.) ¶12 (six hours on phone, transferred to several departments); Ex. 43 (Grenfell Dec.) ¶¶5-11.[23] The Bank still directs some with blocked accounts to EDD for re-verification. *See, e.g.*, Ex. 43 (Grenfell Dec.) ¶7. And the Bank has sometimes re-blocked accounts immediately after unblocking them. *Id.* ¶¶6-7.

The Bank does not even pretend to have changed its claims investigation or customer service procedures, which continue to harm legitimate claimants. *See, e.g.*, Ex. 40 (Barron Dec.) ¶¶10, 16; Ex. 41 (DiMattia Dec.) ¶¶8-18; Ex. 44 (Hollman Dec.) ¶¶10-17. Even those who re-verify their identity (with EDD or the Bank) are not promptly refunded their stolen benefits. Rather, the Bank requires them to assume the burden of requesting (yet again) that their fraud claim be reopened—a requirement the Bank does not reveal unless specifically asked—and then *still* refuses to issue provisional credit. *See* Ex. 42 (Gonzales Dec.) ¶12; Ex. 47 (Peters Dec.) ¶11.

The Bank's remaining objections are equally meritless. First, the Bank contends "the Claim Investigation Mandate is broader than what Plaintiffs could obtain even if they prevailed on the merits." Opp. 11. But injunctions are often framed in different language from underlying contractual or statutory obligations, or include additional terms as needed to remedy and prevent noncompliance. Due process requires only "a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015). Moreover, the UCL "authorizes broad injunctive relief to protect the public from unfair business practices." *Kilgore v. KeyBank, N.A.*, 718 F.3d 1052, 1059 (9th Cir. 2013); *see also Hewlett v. Squaw Valley Ski Corp.*, 54 Cal.App.4th 499, 506 (1997) (UCL remedial authority "extraordinarily broad").[24]

---

[23] The Bank assumes anyone who does not call the new "unblocking" hotline is a criminal, but many do not call because they have already wasted countless hours on futile calls and have no reason to believe another call will be any different. *See, e.g.*, Ex. 49 (Haynes Dec.) ¶4. And claimants whose accounts have been completely drained by fraudulent transactions that the Bank has refused to credit likewise have little reason to call the Bank to try to unblock their accounts.

[24] The Bank cites a North Carolina trial court decision, Opp. 12, but the Cardholder Agreement on its website states that California law governs. *See* Amaral Dec. ¶2, Exh. 1 at 11.

Second, the Bank argues the "Claim Investigation" provisions will provide a "second windfall" to criminals because it "would be a practical impossibility" to resolve all claims in 10 business days. Opp. 16. But EFTA imposes that 10-day requirement for issuance of provisional credit, and "[a]n injunction requiring adherence to the regulations … imposes no inappropriate obligation …." *Withrow v. Concannon*, 942 F.2d 1385, 1388 (9th Cir. 1991). The Bank's "impossibility" argument merely reconfirms that the Bank failed to conduct good faith investigations in the first place.[25] The Bank's argument that the "Account Freeze" provisions will give criminals access to "billions of dollars" held in accounts frozen at EDD's request (Opp. 17) ignores that the injunction specifically authorizes the Bank to keep such accounts frozen and only requires undoing *Bank*-initiated freezes (Proposed PI ¶¶8-9).[26] And nothing in the injunction prohibits the Bank from sharing information with EDD "so that EDD [can] incorporate that information" into its own anti-fraud measures. Opp. 6.

Finally, the Bank argues that requiring it to credit cardholders for claims of unauthorized transactions unless it can point to affirmative evidence of fraud (Proposed PI ¶6) is "a claim of damages" disguised as equitable relief. Opp. 4, 25. But injunctive relief often requires the outlay of funds, especially when restitution is involved. "[T]hat a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Mass.*, 487 U.S. 879, 893-94, 900 (1988); *accord Mathews v. Chevron Corp.*, 362 F.3d 1172, 1186 (9th Cir. 2004). Plaintiffs' requested relief would merely reinstate them to their original positions, as guaranteed by statute and contract, and is entirely proper.[27]

---

[25] The Bank's suggestion that "EDD and the public" will pay the price (Opp. 16) ignores the Bank (not EDD) is solely liable for fraudulent transactions. Kirtley.Dec. Exh. 2 at 75 (Req #337).

[26] To accommodate the Bank's concerns about law enforcement-directed freezes (of which there appear to be only a handful), Plaintiffs submit a modified proposed injunction addressing EDD and law enforcement requests to freeze accounts. *See* Modified [Proposed] Order.

[27] *See Bowen*, 487 U.S. at 895 (damages *substitute* or *compensate* for loss, while specific relief restores or obviates loss). The requested relief also is not "mandatory," because it seeks only to prohibit the Bank from maintaining its unlawful practices and to restore the legally mandated status quo. *See Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017) (injunctive provisions prohibiting future legal violations are prohibitory). But even if a heightened standard of review applied (Opp. 9), Plaintiffs satisfy it because without injunctive relief the Class Members would suffer "extreme or very serious damage … that is not capable of compensation in damages, and the merits of the case are not doubtful." *Id.* at 999 (quotations omitted).

Respectfully submitted,

Dated:  April 29, 2021                   **COTCHETT, PITRE & McCARTHY, LLP**

By:    */s/ Brian Danitz*               
      BRIAN DANITZ

Dated:  April 29, 2021                   **ALTSHULER BERZON LLP**

By:    */s/ Michael Rubin*              
      MICHAEL RUBIN

*Interim Co-Lead Counsel for Plaintiffs
and the Proposed Class*

**SIGNATURE ATTESTATION**

Pursuant to Local Rule 5-1(i)(3), I, Brian Danitz, attest that the other signatories listed, and on whose behalf this filing is submitted, concur in the filing content and have authorized this filing.

/s/ *Brian Danitz*
BRIAN DANITZ